[No. 33330.  Department Two.  January 12, 1956.]

BORIS A. KRENOV, *Respondent*, v. WEST COAST LIFE INSUR-
ANCE COMPANY, *Appellant.*[1]

*McMicken, Rupp & Schweppe,* for appellant.

*Eggerman, Rosling & Williams,* and *DeWitt Williams,* for respondent.

ROSELLINI, J.—This action involves a dispute between an insured and his insurer regarding the latter's obligation to pay the proceeds of a policy in silver.  The significant facts, as found by the trial court, are as follows:

[1]Reported in 292 P. (2d) 209.

On March 24, 1933, the respondent, then a resident of Shanghai, China, purchased from the appellant through its office located in the International Settlement of Shanghai, a twenty-year endowment policy of life insurance, which bore on its face a stamped and typed endorsement reading:

"The premiums and the benefits payable hereunder shall be paid in Shanghai (China) local currency of the present weight and fineness."

At the time the policy was issued, there existed no paper currency bearing the official designation "Shanghai (China) local currency," but that term was an expression recognized and accepted as descriptive of the various silver dollars then generally extant and circulating in Shanghai.

On November 4, 1935, and on August 19, 1948, the government of China promulgated certain monetary decrees having the force and effect of law in China, copies of which decrees were introduced in evidence in this action. By the terms of each decree, all currencies then and theretofore in use in China were wholly withdrawn from circulation and were no longer mediums of exchange, and were replaced by new currencies. While a substantial portion of the silver coinage in China was not surrendered pursuant to the 1935 decree, its use became unlawful.

The respondent paid at the Shanghai office of the appellant all the premiums payable under the policy for the years 1933 to 1941, inclusive. Certain of these premiums were paid by loans against the policy, but all loans against the policy were paid in full prior to March 24, 1942. These premiums and loans were paid by drafts. No evidence was presented as to what kind of currency or coins was called for in these drafts or whether or not they called for silver of the exact weight and fineness of the dollars provided for in the policy. The premiums were received by the appellant and entered on its books as being the equivalent of the Shanghai dollars called for by the policy.

The average price of one dollar of Shanghai (China) local currency expressed in terms of United States currency for the year 1933 was approximately 26 cents. The exchange

rate in 1934 averaged 33.785 United States cents to one Shanghai (China) local dollar, and the exchange rate for 1935 was 36.260. For the first year and a half or two years after the promulgation of the monetary decree of November 4, 1935, the rate of exchange did not fluctuate materially, the rate of exchange being about 30⅞ cents on or about November 4, 1935. Thereafter, Chinese currency, including that in use in Shanghai, embarked upon a highly inflationary trend. In June, 1938, one such dollar was exchangeable for about 15¼ United States cents; in July, 1939, for 12⅝ cents; in August, 1940, for about 7⅜ cents.

Shortly thereafter, Shanghai was occupied by the Japanese, and all open communication between Shanghai and the United States ceased until after the end of World War II, in 1945.

On March 24, 1942, the respondent surrendered his policy at the Shanghai office of the appellant, together with a letter in which he exercised his option to have the policy endorsed for a reduced amount of paid-up insurance, payable at the end of the twenty-year period. The appellant's representative in Shanghai returned the policy to the respondent and notified him that communication with the home office had ceased and that the bookkeeping entries of the transaction could not then be made because of war conditions.

In 1946, foreign exchange with China was resumed, on a limited basis, initially at the rate of 1600 Chinese National Currency dollars to one United States dollar. On August 19, 1946, the rate of exchange was ·3350 CNC dollars to one United States dollar; on December 15, 1946, 6800 CNC dollars to one United States dollar; on December 24, 1946, 7800 CNC dollars to one United States dollar; and such inflation continued. In June of 1948, one United States dollar would have bought 849,000 of such CNC dollars.

By the monetary decree of August 19, 1948, the CNC dollar was abolished and a mandatory conversion imposed, at the rate of 3,000,000 CNC dollars to a monetary unit of new paper currency created by the decree, known as the Gold

Yuan. Four Gold Yuan were exchangeable at the then current rate for one United States dollar.

Immediately after the termination of hostilities and at his first opportunity, the respondent called at the home office of the appellant in San Francisco, on or about May 22, 1946, and was informed by a representative of the appellant that his election to convert the policy had not been entered by the defendant, but that, instead, premiums had been charged and the policy was delinquent, and that the only right the respondent had was to pay the delinquent premiums on the policy. It was suggested to the respondent that he procure a draft for Chinese dollars for such purpose.

The respondent then obtained and delivered to the appellant a draft for $22,185.90 in Chinese National dollars, which draft had a value of approximately $10 in United States money.

The appellant then suggested to the respondent that he obtain another draft to pay the policy in full, and the respondent, acting upon the appellant's suggestion, procured a draft for $23,411.96 of the same currency, which draft cost him approximately $2, in United States money.

The evidence reveals that on July 19, 1951, the appellant wrote to the respondent stating that, in answer to his inquiry, the policy had a present value of "less than one fen, the smallest unit of currency." When the policy matured on March 24, 1953, the respondent made demand for payment according to the 1953 value of the amount of silver contained in $80,000 of 1933 Chinese currency. Upon refusal of this demand, this suit was instituted for the recovery of the proceeds alleged to be due, in the sum of $51,512.44, plus interest and unascertained dividends.

The trial court concluded that the respondent had successfully exercised his option to convert the policy in 1942, and that the subsequent premium payments were null and void. It further concluded that the respondent was entitled to receive payment of this reduced amount of insurance in United States funds sufficient to buy the amount of silver

bullion contained in 38,200 Shanghai, 1933, dollars, and that the respondent was not estopped to assert and claim recovery of silver bullion or its equivalent in United States funds. Judgment was entered in favor of the respondent in the sum of $26,136.11, with interest from March 24, 1953.

A considerable portion of the briefs is devoted to learned discussions of the legal significance of gold (or silver) clauses in contracts and the relief obtainable under them. However, under the view which we take of the evidence, it will be unnecessary to consider this aspect of the case.

The appellant has assigned error to the trial court's refusal to make and enter the following proposed finding of fact:

"At no time did the plaintiff in the making of any payments, either of premium or repayment of loan, or in receipt from the company of moneys loaned to him under the policy, attempt to equate them to silver or to the weight and fineness of any dollars which were in circulation or use at the time of the issuance of said policy."

This proposed finding is supported by the evidence and should have been entered. The respondent admitted on cross-examination that he paid the premiums and accepted loans by draft, that the premium drafts were in the amounts of the premium calls, and that no attempt was made to equate the payments to the standard of weight and fineness of any currency which existed at the time the policy was issued in 1933. Furthermore, according to the trial court's findings, there clearly was no attempt to equate the payments made after the exercise of the option to convert. The court concluded that these transactions were null and void and refused to consider their probative value in determining the understanding of the parties as to the significance of the "silver clause" in the contract. However, the court recognized, in its memorandum opinion, that if effect were given to these payments, a clear case of estoppel would be established. Moreover, the only reasonable inference to be derived from the finding that after 1935 the use of the designated silver coin was unlawful, is that the drafts used in payment did not call for such coin.

The respondent objected to the admission of testimony concerning the medium in which the premiums and loans were paid, on the ground that the appellant, having accepted the payments in full discharge of the premium obligation, is estopped to assert that they were not made in silver. The appellant, on the other hand, argues that, having made his payments and accepted loans in an inflated currency, the respondent is estopped to assert that the proceeds are payable in silver.

Against whom should the estoppel operate? The elements of an estoppel *in pais* are most recently stated in *Peplinski v. Campbell*, 37 Wn. (2d) 857, 226 P. (2d) 211 (1951). We recognized, as in *Kessinger v. Anderson*, 31 Wn. (2d) 157, 196 P. (2d) 289 (1948), cited therein, that three things must occur to constitute an estoppel *in pais*:

"(1) An admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party *on the faith* of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act." (Italics ours.)

When the appellant accepted premium payments in inflated currencies, was the respondent entitled to believe that the proceeds would nevertheless be paid in silver, that for approximately $12, for example, he would receive by way of proceeds approximately $27,000? That he made no such assumption, is indicated by his letter to the appellant, dated at Shanghai on October 8, 1938, and admitted in evidence, which reads:

"Re: Policy No. 204902 — 20 Years Endowment for $80,-000

"The above policy was taken up by me, not for the purpose of protection but as my Savings and Investment Plan. With the present perturbing state of Chinese Currency, it is a very problematic question whether I should keep up this policy or whether I should let it lapse. At present I have taken up already practically all loan values; therefore dropping the policy does not constitute for me a big financial loss.

"I am, however, willing to carry on with the policy pro-

vided I receive from you satisfactory clarification of the two following points: —

"1. *Can I*, at some time in the future, change this policy to some other currency such as U. S. Dollars or L Sterling at the current rate of exchange? I know that this point is not guaranteed in the conditions of the policy. I know, however, that the Company has been practicing making such changes; moreover, I was authorized as an Agent of of your Company when selling policies to quote to my clients that such change is effected by the Company; and also when taking out the policy I was assured that such change would be undertaken.

"2. *How to* understand the question of Currency in which I have my Insurance? The Policy reads: 80,000.—Dollars Shanghai (China) Local Currency.

"a) Does it mean that I am insured in Shanghai Currency and have nothing to do with China Currency?

"b) If so, what will happen to the Policy if the Shanghai Currency will be changed and will be called not Dollars but by some other name, say for instance, Yuan or Yen or Sterling etc. Will, in such event, the Policy be rewritten into currency of such respective name?"

On the other hand, when the appellant was tendered premium payments in the extant currency, and when loans were accepted and paid in the same medium, was it not entitled to believe that the respondent placed upon the contract the same interpretation given it by the appellant, that the premiums and benefits were payable in currency circulating legally at the time of such payments, and not in silver coin, the use of which had long since been declared unlawful? If the policy is enforced as a silver contract, the appellant will be injured by the respondent's acts to the extent of the judgment entered against it, for it is apparently conceded that if the policy does not call for payment of premiums and benefits in silver, it is presently worthless. Conversely, if the policy is enforced as an ordinary insurance contract payable in the currency circulating legally at the time of payment, the respondent will be harmed, but the injury will be due, not to any act or omission of the appellant but to circumstances beyond the con-

trol of either party. It is a type of loss which falls alike on all who deal in any given currency, and the risk of such loss is one normally incident to any transaction which involves a monetary investment.

The respondent argues that the defense of estoppel is foreclosed because not pleaded. Assuming that the facts pleaded were not sufficient to raise the question of estoppel, the evidence adduced at the trial establishes the defense.

■ Where evidence is admitted without objection, the pleadings will be treated as amended to conform to the proof, and the court will consider the question of estoppel if there is evidence showing such fact. *Beaulaurier v. Washington State Hop Producers*, 8 Wn. (2d) 79, 111 P. (2d) 559 (1941).

■ The respondent did not object to the introduction of the evidence on the ground that estoppel had not been pleaded, but on an entirely different ground which, as we have indicated above, was without merit. We held in *Cary-Davis Towing Co. v. Spradley*, 115 Wash. 93, 196 Pac. 655 (1921), that this court will not consider error assigned to the admission of evidence, where objection was made in the trial court on a ground different from that urged upon appeal. By the same token, an objection which fails to point out that the proffered evidence is irrelevant under the pleadings, will not prevent the application of the rule that the pleadings will be deemed amended to conform to the proof.

■ We conclude that, having treated the policy as one calling for the payment of premiums in the medium of exchange current at the time of each payment, the respondent is estopped to assert that it calls for the payment of benefits in Shanghai, 1933, silver dollars or their present equivalent in value.

The judgment is reversed.

HAMLEY, C. J., MALLERY, HILL, and WEAVER, JJ., concur.

———

March 30, 1956. Petition for rehearing denied.