[Civ. No. 19489.   First Dist., Div. One.   Oct. 26, 1961.]

MANUEL STERNBERG, Appellant, v. WEST COAST LIFE INSURANCE COMPANY (a Corporation), Respondent.

George Olshausen and Renzo Turco for Appellant.

Allan, Miller, Groezinger, Keesling & Martin and Robert Metcalf Jones for Respondent.

TOBRINER, J.—Challenging the trial court's conclusions that two life insurance policies had become valueless due to the depreciation of Chinese currency and that an estoppel barred appellant from claiming payment in Shanghai Taels Sycee, appellant appeals from a judgment for respondent in his action for declaratory relief. We set forth our reasons *infra* for holding that the trial court properly determined that the devaluation of Chinese currency had rendered the policies valueless and that appellant was ''estopped . . . from asserting that any benefits payable under either policy of insurance'' were payable in the Chinese money in circulation at the date the policies took effect.

On August 20, 1925, respondent issued to appellant, a resident of China, its life insurance policy in the face amount of ''5,000.00 Taels, Shanghai Sycee,'' premiums to be paid annually in taels until ''premiums for twenty full years in all shall have been paid.'' On May 1, 1928, respondent issued a second policy to appellant in the ''face value of 10,000 United States Dollars'' which respondent amended at appellant's request on November 25, 1932, to substitute a face value of 33,000 Shanghai Taels Sycee. That policy provided that ''premiums and . . . benefits payable hereunder shall be paid in Taels, Shanghai Sycee currency of the present weight and fineness.''

'' [O]n April 6, 1933 the Government of the Republic of China issued a Decree calling in the Taels Shanghai Sycee and issued new currency of which the par value was 71½% of the Value of the Shanghai Taels Sycee'';[1] after that date and up to and including August, 1935, appellant paid and respondent accepted premium payments in Standard Silver Dollars, the new currency. On November 4, 1935, the Chinese Government ''issued a Decree calling in the Standard Silver Dollars, creating Bank Notes as legal tender known as Chinese National Currency''; thereafter appellant paid and respondent accepted ''all the remaining premiums in . . . Chinese National Currency Dollars. . . .'' The first policy became paid-up on August 20, 1945; the second as of May 1, 1947.

---

[1] The statements in quotations are taken from the trial court's findings.

Finally, "on August 19, 1948 the Government of the Republic of China issued a Currency Reform Decree suspending the use of Chinese National Currency and ordering the surrender and conversion of Chinese National Currency to Gold Yuan at the rate of 3,000,000 Chinese National Currency Dollars to one Gold Yuan"; the paper currency issued upon the basis of the Gold Yuan depreciated and became valueless.

Respondent maintained reserves in China in the existing Chinese currencies with which to meet liabilities under the policies; as a result of the depreciation of the Chinese currency and its conversion in 1948 to Gold Yuan, such reserves, after conversion, became valueless. During the period when the first policy was effective, appellant borrowed on it and repaid the loans "in Chinese Standard Silver Dollars from April 6, 1933 to November 4, 1935 and in Chinese National Currency from November 10, 1935 to August 19, 1948." Likewise "after 1933 . . . [appellant] obtained loans" on the second "in the currency of the Republic of China at the time of said loans, and repaid said loans" in that currency at the date of the repayments.

When, on May 1, 1947, appellant requested an amendment to the second policy to convert it to paid-up insurance, respondent "requested . . . [appellant] to pay," and appellant did pay "12,511.76 Chinese National Currency Dollars, at the then rate of exchange, plus the value of . . . paid-up additions" to the policy. The total purchasing power of these sums "was then less than one United States Dollar. . . ." The amendment, attached to the second policy stated "that the cash surrender value should be payable in Shanghai Dollars"; yet appellant "never objected" to such a prescription "until a number of years thereafter. . . ."

The court found that appellant "was aware that both said policies . . . were not commodity policies, but were Chinese Money policies subject to monetary Decrees of the Chinese Government," and that appellant "was aware that at the time of said Amendment [that] said Amendment and . . . [appellant's] affidavit in connection therewith expressly recognized that said policies were Chinese National Currency Policies." The court concluded that the two policies were "valueless" and of "no further force and effect," that "as a result of the acts and conduct of . . . [appellant] and . . . [respondent's] reliance thereon . . . [appellant] is now estopped and precluded . . . from asserting that any benefits payable under either policy of insurance are payable in

Shanghai Taels Sycee.'' The court rendered judgment for respondent and denied appellant's subsequent motion for a new trial. Appellant appeals from the judgment.

The key issue in this case turns upon the question whether an insurance policy payable in Chinese currency at San Francisco, California, is to be regarded as a commodity contract for silver, payable in dollars at the date of requested payment, or as a contract by which the parties, having named a foreign currency as the media for the discharge of the obligation, contemplated payment in the foreign currency and assumed the risks of its fluctuation. A second issue, which we discuss thereafter, involves the validity of the trial court's finding that an estoppel barred appellant's claim.

As we shall point out, we believe the cases and commentators support the conclusion that appellant can recover only an amount equal to the cash surrender value of the policy in the current Chinese currency determined as of the date of requested payment. When parties name a specified currency for the payment of an obligation, they know that such a currency falls under the control of the government that issues it, and they realize, too, that the currency is therefore subject to fluctuation. The pages of economic history are filled with the annals of fallen currencies of the past and with accounts of the rise and demise of media of exchange. Inherent in the idea of money itself lies the power of the sovereign to change its value. Implied in the terms of the parties' contract fixing a designated media for payment lies a correlative recognition that they assume the risks of appreciation or depreciation in the value of the media.

Thus the courts have held that acceptance of a particular monetary symbol for the discharge of the debt constitutes an implied acceptance of the issuing government's control of the value of that symbol; the contract itself contains a ''congenital infirmity'' equated to that control. The gold devaluation cases express that concept; thus, in *Norman* v. *Baltimore & O. R. Co.* (1934), 294 U.S. 240 [55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352] Chief Justice Hughes explains that ''contracts must be understood as having been made in reference to the possible exercise of the rightful authority of the Government, and . . . no obligation of a contract 'can extend to the defeat' of that authority. *Knox* v. *Lee, supra,* pp. 549-551 [12 Wall. (U.S.) 457 (20 L.Ed. 287)].'' (P. 305.) The Chief Justice specifies that ''when contracts deal with a subject matter

which lies within the control of the Congress, they have a congenital infirmity." (Pp. 307-308.)

In an earlier and decisive case on the issue, Justice Holmes had, indeed, recognized that when parties agree that payment may be discharged in a foreign media they take cognizance of congenital infirmity. In *Deutsche Bank Filiale Nurnberg* v. *Humphrey* (1926), 272 U.S. 517 [47 S.Ct. 166, 71 L.Ed. 383] an "American citizen deposited money, payable on demand, in a German Bank in Germany, and demanded it . . . on . . . June 12, 1915." (P. 518.) Although "[t]he value of the mark fell after that date," the "Courts below held that [the debt] should be translated into dollars at the rate of exchange existing when the demand was made." (P. 518.) Reversing the lower courts, the Supreme Court held the obligation "to be a liability in marks alone and . . . open to satisfaction by the payment of that number of marks, at any time" and hence payable in depreciated marks at the date of judgment. (P. 519.) Justice Holmes premises this conclusion upon the fact that "[a]n obligation in terms of the currency of a country takes the risk of currency fluctuations and whether creditor or debtor profits by the change the law takes no account of it." (P. 519.)

In a case which presents the almost identical problem which we probe here, *Patak* v. *West Coast Life Insurance Company*, *No. 641,062*, dated June 15, 1956, Judge Palmer of the Los Angeles Superior Court concluded that an insurance policy payable in San Francisco in " 'Tientsin (China) Local Currency of the Present Weight and Fineness' " was dischargeable in the depreciated Chinese medium. The court determined that although that currency "was based on a silver standard," the policy did not require the insured or the insurer to pay in silver; the policy was "not an agreement for payment in any commodity," but a contract "for the payment of money." Judge Palmer points out that "the legend stamped on the policy . . . to the effect that the premiums and benefits payable under the policy shall be paid in 'Tientsin (China) Local Currency of the Present Weight and Fineness' . . . did not make the policy a commodity contract and did not fortify it against the power of government. It still was a contract for money, having the 'congenital infirmity' commented on by Chief Justice Hughes. . . . Both parties . . . took the same chance on the stability or changeability or uncertainty of the currency for which they contracted."

Corbin analyzes the problem in these terms: "Values are

determined in terms of United States legal tender money; and this is so even when the commodity to be valued is the current money of a foreign country. Fluctuation in the rates of exchange has been very great and very rapid since World War I, leading to difficulty and dispute in the valuing process. It has been held in New York that for breach of a legal duty to pay a sum of money in foreign currency, the damages to be awarded in our courts are measured by the exchange value of that money in dollars at the date of breach. This appears to be the present rule in New York irrespective of the place of payment. Also, it appears to be the rule followed in England." (Corbin on Contracts, § 1005, pp. 47, 49; footnotes omitted.) Corbin, too, points out that: "One who bargains for a specified performance that is promised him may in most cases properly be regarded as having intentionally assumed the risk of ordinary fluctuation in the value of that performance at the time fixed for its rendition." (P. 52.)

Finally, the principle finds expression in the Restatement of the Law of Conflict of Laws: "Damages for breach of a contract to deliver money not currency of the state where the delivery is to be made are measured in currency of the state of performance at the rate of exchange current at the time of breach." (§ 423, p. 501.)

We turn to appellant's bilateral attack upon the trial court's conclusion that the parties impliedly recognized the Chinese Government's control of the value of the currency and subjected themselves to its depreciation. Appellant contends, first, that respondent fails to sustain the real position which it must establish: the impossibility of performance of the contracts, and, second, that the parties allegedly entered into modifications of the contract which call for apportionment of the total value of the policies in accordance with the premiums paid. We shall consider each argument separately.

■ Appellant submits an exhaustive exposition of the argument that since the policies were payable in California, California law applies; that an alteration of a Chinese law does not establish the defense of illegality in California; that the issue becomes that of the impossibility of performance or commercial frustration and that the record sustains neither of the latter. Appellant claims that the "trial judge thought that these Chinese decrees governed the policies" and that the Chinese decrees were as effective in depreciating the currency as the Congress of the United States in devaluating the dollar, in accord with *Norman* v. *Baltimore & O. R. Co., supra,* 294

U.S. 240. According to appellant, "[b]y relying on that case, the trial Court overlooked all the distinctions which exist among the cases involving change of law."

The structure of the whole argument of appellant, however, lies on the foundation that the judgment rests solely upon the concept that the Chinese decrees in themselves altered the value of the currency and that these decrees served as the basis for the invocation of the doctrine of impossibility of performance. We do not think the judgment rests upon these considerations. Instead, as we have pointed out, *supra*, it relies upon the parties' inclusion in their agreements that payment be made in the Chinese currency and in their acceptance of its fluctuating value. The locus of payment cannot change the selected monetary media of payment. The parties named Chinese money as the media of payment, and their acceptance of the Chinese Government's control over its own currency does not collapse because they said the money should be paid outside of China.

The United States Supreme Court in *Hicks* v. *Guinness* (1925), 269 U.S. 71 [46 S.Ct. 46, 70 L.Ed. 168], again speaking through Justice Holmes, offers the final disposition of this argument of appellant. The court probed the situation in which the debtor owed marks which were payable in the United States. The court ruled that the creditor was entitled "to recover the value in dollars that the mark had when the account was stated." (P. 80.)

We turn to appellant's second contention: that "the parties by agreement paid and accepted premiums in money other than the taels provided by the policies" and that this change in the payment of premiums constituted a "modification" of the agreement which must be reflected in the value of the policies. According to appellant, on the smaller policy "over ten years of premiums [were] paid in silver money which did not depreciate" and "over seven years of payments of undepreciated premiums [were made] on the larger policy." Thus "if the cash surrender value were to reflect the money in which the premiums were paid, it would have to be given a value which bore the same relation to its face value as the actual total value of the premiums bore to their total face value." To support this contention appellant relies on *Krenov* v. *West Coast Life Ins. Co.* (1956), 48 Wn.2d 180 [292 P.2d 209].

We believe appellant would contort the subsequent acts of the parties, which merely show their original intent as to the

nature of the contract, into an unjustified reformation of it. The insured paid his premiums, and in 1947 met the costs of conversion of the policy, in the current media of payment; the insurer did likewise as to loans, dividends, and maintenance of reserves. These acts show that the parties intended that at any given time the obligations under the policies were to be discharged in the media then in circulation; when the media changed, the parties conformed their payments to it.

We do not see how *Krenov* aids appellant. Appellant contends that his premium payments should be converted into their value in silver and that the value of the policies should correspondingly be projected into an amount proportionate to such silver payments. Appellant says *Krenov* stands for this principle. That case, however, rejects the theory that the policy should be ''enforced as a silver contract'' and treats the policy as ''an ordinary insurance contract payable in the currency circulating legally at the time of payment. . . .'' (P. 186.) The court bases an estoppel against the insured in part upon the fact that he ''paid the premiums and accepted loans by draft, that the premium drafts were in the amounts of the premium calls, and that *no attempt was made to equate the payments to the standard of weight and fineness of any currency which existed at the time the policy was issued in 1933.*'' (P. 184; emphasis added.)

We conclude that the facts upon which appellant would posit a modification of the contract are no more than manifestations by the parties of its original meaning.

██ Turning to the second issue, we believe the trial court's finding of estoppel as against appellant is properly grounded upon fact and law.

The factual support lies in the following events: (1) After 1935 appellant paid premiums in the current currency and did not attempt to equate his payments to the value of silver, (2) appellant borrowed taels on policy No. 200614 on April 18, 1933, and Chinese national currency on August 14, 1937, (3) the loans were repaid on April 30, 1941, in Chinese national currency, (4) the company's letters, dated August 8, 1946, and April 15, 1947, sent to appellant, which appellant admitted he saw, designated the policies as payable in Shanghai dollars, (5) on April 30, 1947, appellant submitted to respondent an affidavit concerning policy No. 202530, the amount of which he described as ''SH\$ 46153,'' (6) when in May, 1947, appellant requested an amendment of his policy No. 202530 making it a paid-up policy, the company attached a

rider to the policy designating the policy as paid-up and payable in Shanghai dollars, and appellant's alleged failure to have read the endorsement does not negate his duty to have done so, (7) appellant paid the final premium in Chinese National Dollars.

The historical background of the currency situation in 1932, when appellant requested respondent to amend the second policy to substitute for the face value of 10,000 United States Dollars the figure of 33,000 Shanghai Taels Sycee, lends particular weight to the trial court's conclusion. Since, in the period immediately after World War I, the currencies of many countries underwent inflationary spirals, appellant may have been motivated in making the change in the policies by the fear of inflation of the dollar, a fear which was not uncommon. If the Chinese currency had appreciated, and he had chosen to surrender his policy at the higher value, we would have been hard put to deny him the advantages of his choice. Accordingly, we cannot regard appellant's selection as a one-way route to appreciative increase in the value of the policy without a corresponding assumption of the possibility of a depreciative reduction. Appellant elected the Chinese currency, and he necessarily accepted the risks attendant to his choice.

The case of *Krenov* v. *West Coast Life Ins. Co., supra,* 48 Wn.2d 180 [292 P.2d 209], offers a pertinent and recent expression upon the matter of estoppel as to facts like those here. There plaintiff had purchased a policy in 1933 under which " '[t]he premiums and the benefits' " were payable " 'in Shanghai (China) local currency of the present weight and fineness.' " (P. 181.) Silver dollars were then in circulation. At no time did the insured attempt to equate his premium payments "to the standard of weight and fineness of any currency which existed at the time the policy was issued in 1933." (P. 184.) The court said: " [W]hen the appellant [insurance company] was tendered premium payments in the extant currency, and when loans were accepted and paid in the same medium, was it not entitled to believe that the respondent [insured] placed upon the contract the same interpretation given it by the appellant, that the premiums and benefits were payable in currency circulating legally at the time of such payments, and not in silver coin, the use of which had long since been declared unlawful? If the policy is enforced as a silver contract, the appellant will be injured by the respondent's acts to the extent of the judgment entered against

it, for it is apparently conceded that if the policy does not call for payment of premiums and benefits in silver, it is presently worthless." (P. 186.)

The court concluded that "having treated the policy as one calling for the payment of premiums in the medium of exchange current at the time of each payment, the respondent is estopped to assert that it calls for the payment of benefits in Shanghai, 1933, silver dollars or their present equivalent in value." (P. 187.) The court refused payment to the insured of any proportionate amount of the policy equated to the premiums actually paid in silver; an estoppel barred the insured from claiming that the policy called for payment in silver or the dollar value of such silver.

Since appellant chose a foreign media for the discharge of the insurance company's obligation he accepted the risk of fluctuation in the value of such currency: his own contract and an estoppel bars his present claim. As Bankes, L. J., said as to the insured in the comparable case of *Anderson* v. *Equitable Assurance Society of the United States* (1926), 134 Law Times 557: " 'He cannot, to use Lord Kenyon's expression, "blow hot and cold." ' " Then he quotes Littleton *'Electio semel facta patitur regressum'* (Co. Litt. 146n)." (P. 563.)

We affirm the judgment.

Bray, P. J., concurred.

A petition for a rehearing was denied November 21, 1961, and appellant's petition for a hearing by the Supreme Court was denied December 20, 1961.