SHANGHAI POWER COMPANY, Plaintiff,

v.

DELAWARE TRUST COMPANY (as Successor Trustee under the Mortgage and Deed of Trust Dated as of February 1, 1933, by Shanghai Power Company), et al., Defendants.

Court of Chancery of Delaware, New Castle.

Jan. 17, 1974.

Rodney M. Layton, and R. Franklin Balotti, Richards, Layton & Finger, Wilmington, and Richard C. Allison, and Marvin G. Goldman, Reid & Priest, New York City for plaintiff Shanghai Power Co.

Hugh Corroon, Potter, Anderson & Corroon, Wilmington, for defendant Delaware Trust Co.

William E. Taylor, Jr., Wilmington, and Philip W. Coyle, and David J. Wynne, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant S. A. Judah.

BROWN, Vice Chancellor.

Upon the motion of the Plaintiff, Shanghai Power Company for summary judgment.

By its complaint Plaintiff Shanghai Power Company (hereafter referred to as "SPC") is seeking a declaratory judgment determining that two classes of corporate securities of which SPC is the issuer—namely, SPC's Silver Preferred Stock or 6 Tael Preferred Stock (hereafter referred to as "6 Tael Stock") and 5½ percent First Mortgage Debentures Due 1973 (hereafter referred to as "Debentures") are without value.

Such relief is opposed by the Defendant Delaware Trust Company (hereafter "Delaware Trust") as successor trustee under SPC's Mortgage and Deed of Trust dated as of February 1, 1933, and also by the Defendant S. A. Judah (hereafter "Judah") on behalf of himself and all other holders of the 6 Tael Stock.

Delaware Trust represents the approximately 1800 holders of SPC's Debentures and contends that the Debentures have value and that the holders are entitled under the mortgage indenture to any proceeds received by SPC in connection with awards made by the Foreign Claims Settlement Commission of the United States (hereafter "FCSC") in return for the expropriation of SPC's indentured properties.

Judah contends on behalf of all holders of the 6 Tael Stock that the stock does have value and that they are entitled to payment either in silver or in a currency which will give the stockholders the same quantity of silver.

SPC has obtained the necessary license to institute this suit from the Foreign Assets Control Division of the United States Treasury Department, and has now moved for summary judgment. Both Judah and Delaware Trust have counterclaimed for declaratory relief in support of their respective positions, and Judah has belatedly moved for summary judgment. Delaware Trust has not.

The factual background which has given rise to the issues is exceeded in interest only by the complexity of the legal prob-

lems which it has presented. SPC was organized as a Delaware corporation in 1929 for the purpose of acquiring and operating a public utility system in the International Settlement in Shanghai, China. In order to finance the acquisition and to provide for the improvement and expansion of the system SPC sold to the public both the Debentures and the 6 Tael Stock. Delaware Trust asserts that funds used for the purchase of the properties derived primarily from the proceeds realized from the sale of the Debentures. The Debentures were issued in China from time to time during 1933–1935. The 6 Tael Stock, consisting of 220,000 shares, was sold in China during 1930–1931. Dividends, liquidation and redemption values of the 6 Tael Stock, and the principal amount and interest on the Debentures, are now and always have been denominated in Chinese currency.

The Shanghai Tael was the local Chinese currency in circulation in Shanghai, China at the time of the issuance of the stock. Effective April 5, 1933, the Chinese Government adopted the "Decree on the Implementation of the Substitution of the Yuan [i. e., Chinese Silver Dollar] for the Tael". The effect of this decree is said to have abolished the Shanghai Tael and substituted in its place the Chinese Silver Dollar as legal tender. Regulations authorized by the Decree fixed one Chinese Silver Dollar as the equivalent of .715 Shanghai Tael.

The Debentures were originally denominated in Shanghai Taels but, upon the abolition of the Tael, interim certificates representing issued Debentures were withdrawn and certificates in Chinese Silver Dollars were issued in lieu thereof. Subsequent issuances of Debentures, made through February 1935 were denominated in Chinese Silver Dollars.

In November 1935 the Chinese Government issued another decree, the "Decree on Measures for Stabilizing Currency and Banking", which abolished the use of silver dollars or bullion for currency purposes,

established certain banknotes for ordinary Chinese Dollars as full legal tender, and directed in effect that all contractual obligations in Chinese Silver Dollars thereafter be discharged in legal tender Chinese Dollars in the nominal amount due on a one-for-one basis.

Subsequently matters worsened, and between 1935 and 1948 the Chinese Dollar continued to depreciate at an unrelenting pace. Ultimately, in 1948, the Nationalist Chinese Government promulgated further regulations which introduced a new currency, the "Gold Yuan", in substitution for the Chinese Dollar at the ratio of one new Gold Yuan for 3,000,000 Chinese Dollars. Approximately one year later, however, the ratio had grown to 27,000 billion Chinese Dollars for one Gold Yuan. Upon the takeover of Shanghai by the Chinese Communists in 1949 the Communist Chinese Government replaced the Yuan with a new currency known as the jen-min-pi ("JMP"). The exchange ratio was 100,000 Yuan to one JMP. Later, in 1955, the Chinese Communist Government decreed the conversion of all JMP into a new JMP at the ratio of 10,000 old to one new. By applying the foregoing conversion ratios, starting from the Shanghai Tael through the present new JMP it is represented that one new JMP today is equivalent to approximately 2,145 trillion Shanghai Taels or approximately 3,000 trillion Chinese Dollars.

SPC thus argues that as the result of the foregoing factors, the liquidating and redemption values of and all cumulative dividends on SPC's 6 Tael Stock, and the aggregate principal amount of and all back interest on SPC's Debentures, amount to a fraction of one cent, and thus such securities are without value.

On the other hand, while time was steadily eroding the value of Chinese currency, the fortunes of war and governmental change thrust themselves upon the business activity of SPC. During 1937 damages were inflicted upon its properties by reason

of Chinese-Japanese hostilities and later Japan seized control of the properties from December 8, 1941 through September 1945. After the war the regime of Nationalist China gradually collapsed and was replaced by Communist China. Around 1950 the Communist China regime expropriated the properties of SPC and since that time SPC has not operated any public utility system and has been entirely inactive in a business sense.

However, in 1964 SPC filed a claim under the War Claims Act of 1948 and as a result, on February 8, 1967 the FCSC issued an award in favor of SPC in the amount of $7,808,208.12 as compensation for damages resulting from the aforesaid Japanese activities. This award was based ". . . upon the loss and damage to improved real property, certain equipment used for the generating, transmission and distribution of electricity in Shanghai, China. . . ." SPC has received partial payment of the award in the amount of $4,801,301.58. It has also filed a separate claim for the confiscation of its properties by Communist China and has had its loss established in excess of $53,000,000, but as yet that government has made no actual payment nor any commitment to make any.

All of the common stock of SPC is owned by Far East Power Corporation which, through connecting corporate structures, is controlled by Boise Cascade Corporation, a Delaware corporation. The common stock of SPC is the only security with voting rights.

Thus the present situation is one wherein SPC apparently has no property or facilities with which to carry on its business, but has several million dollars which it has received as compensation for damages to its property by one government before it was totally taken by another. Presumably its only remaining obligations of large consequence are the Debentures and 6 Tael Stock which it now seeks to have declared as no obligations at all since the Chinese tender in which they are to be paid is worthless.

## I. As To The 6 Tael Stock

The question as to whether or not the 6 Tael Stock has any value involves certain basic principles. To begin with, it is a preferred stock. At common law and in the absence of an agreement to the contrary, all shares of stock are equal and thus, unless preferences are clearly spelled out in the certificate of incorporation (or by a separate resolution authorized by the corporate charter) they do not exist. Gaskill v. Gladys Belle Oil Co., 16 Del.Ch. 289, 146 A. 337 (1929). It is therefore fundamental that the rights of preferred shareholders are governed by the certificate of incorporation. Hodgman v. Atlantic Refining Company, D.C.Del., 2 F. 2d 893 (1924).

The certificate of incorporation in this case provides initially that "The Silver Preferred Stock is entitled to cumulative dividends at the rate of 6 Shanghai Taels per annum and no more . . . ." In the event of liquidation, dissolution or winding up it is entitled to a preference of "100 Shanghai Taels per share". The redemption price is stated to be "110 Shanghai Taels for each share" redeemed. Then comes the following language which lies at the heart of the matter:

"Notwithstanding anything in this resolution stated to the contrary, each obligation and/or right of the corporation expressed in this resolution with reference to any payment in taels on account of the Silver Preferred Stock, whether as to dividends or as to distribution of assets or as to redemption of any such stock or otherwise, shall be *measured and determined with reference* to the Shanghai Tael which for all purposes hereof *is defined* as a unit of currency *representing* 518.512 grains troy (or 33.-599 grammes) of pure silver (1000 fine) and any payment by the corporation in either silver bullion or in any coin or

coins or any money which shall give the stockholder the same quantity of silver as he would have obtained had he been paid in Shanghai Taels *as herein defined,* shall be considered a satisfaction of all the corporation's obligations in respect of said Silver Preferred Stock; provided further, that *if the Shanghai Tael, as so defined, shall cease to be a unit of currency or exchange in the territory* on December 31, 1929, or thereafter comprised within the Foreign Community of Shanghai, China, north of the Yangkingpang, and *some other unit shall be substituted therefor* or be currently used in lieu thereof, whether of the same or of a different name, *then from and after such* substitution or change in current usage *each obligation and/or right of the corporation expressed herein with reference to any payment in taels on account of the Silver Preferred Stock,* * * * *shall, at the option of the corporation, be an obligation* and/or right, as the case may be, of the corporation *to make such payment in silver or in such other unit of currency in such amount in each case as would be the equivalent in said other unit of currency of the amount of said payment in Shanghai Taels, the basis* for the determination of such equivalent amount *being the ratio existing between the Shanghai Tael and such other unit of currency at the time of such substitution* or such change in current usage."

"Every dividend and/or payment in distribution of assets and/or payment in redemption with respect to the Silver Preferred Stock *may be paid* in each case *in silver or in any currency* (Whether representing the Shanghai Tael or any other unit of currency substituted therefor or currently used in lieu thereof as herein provided) *at that time legal tender in the territory* on December 31, 1929, *or thereafter comprised within the territory* now embraced within the Foreign Community of Shanghai, China, North of the Yangkingpang, for the payment of either private debts or public taxes, *as the Board of Directors shall elect."* (Emphasis added)

■ Under Delaware law, the rights of stockholders are contract rights; Ellingwood v. Wolf's Head Oil Refining Co., Del.Supr., 27 Del.Ch. 356, 38 A.2d 743 (1944); Gaskill v. Gladys Belle Oil Co., supra, and in interpreting charter provisions with regard to stock preferences, the same method is applied as that which is followed in interpreting written contracts generally. Nothing is to be presumed in favor of preferences attached to stock, but rather they must be expressed in clear language. Ellingwood v. Wolf's Head Oil Refining Co., supra.

■ In reviewing the foregoing charter provisions I cannot find that SPC obligated itself to pay in silver or silver's worth with regard to the 6 Tael Stock. The stock is denominated in Taels and the obligation of SPC is said to be "measured and determined" with "reference" to the Shanghai Tael. The then silver content of the Tael was used for this purpose. SPC reserved the right to pay its obligations on the stock either in (1) silver bullion or any coin which would give a stockholder the same quantity or silver as would the Shanghai Tael, or in (2) any unit of currency substituted for the Tael in the territory north of the Yangkingpang. It seems clear that the reference to silver was merely to set the standard in the event that SPC should elect at any time to pay in silver. The option to also make payment in any coin of the territory thereafter substituted for the Tael belies any fixed obligation to pay in silver and negates any thought of a commodity contract requiring payment in silver alone.

I am further satisfied that the 1935 Decree abrogated the option to make payment in silver since it forbade the use of silver as a medium of payment in China thereafter and made it a criminal offense to employ silver in payment of any existing debt. Although Judah contends that this Decree

could not have applied to SPC since it had extraterritorial status at the time, it would seem to follow that even if this was once true, the abolition of the extraterritorial status by governmental treaty in 1943 would have done away with such an exemption.

Judah further argues at great length that the last above-quoted paragraph from SPC's charter actually limits SPC's option to that of paying in any substituted currency which might exist at the time of payment within the Foreign Community or Settlement of Shanghai. Thus, it is argued, since extraterritoriality was terminated by treaty in 1943 and since the Foreign Community of Shanghai no longer exists, there can presently be no currency of such Foreign Community with which to make payment and consequently, by the terms of the certificate of incorporation, SPC has no choice but to pay cumulative dividends, etc. on such preferred stock in silver or its equivalent. While I am impressed with the ingenuity and historical documentation of this argument, I cannot agree with it.

In the first place, the word "territory" as it appears in the quoted portion of the certificate of incorporation, is clearly employed, at least to my mind, in a geographical as opposed to a political sense. This interpretation is buttressed by the fact that the offering circular for the sale of the 6 Tael Stock discloses that at the time the stock was offered the corporation also supplied power to adjacent areas outside the boundaries of the settlement of Shanghai. If, in fact, SPC supplied power to areas outside of the Settlement north of the Yangkingpang, there is no reason to believe that it would limit the currency for the payment of its corporate obligations to that used only within the Settlement.

Of more significance, both Judah and SPC agree that at the time SPC was incorporated it was common knowledge that the replacement of the local Shanghai Tael with a national Chinese currency was imminent and that the eventual termination of the extraterritorial status of the Shanghai Settlement was not far away. Thus, to adopt Judah's interpretation of the provisions of the certificate of incorporation would require a finding that the drafters thereof specifically included an alternate means of payment in a unit other than silver and at the same time deliberately restricted such alternate means of payment to a media which they had good reason to believe would shortly cease to exist. To strive for such an illogical interpretation of language which, by its terms, does not clearly so state is unacceptable.

Consequently, for the foregoing reasons, I am of the opinion that the holders of the 6 Tael Stock have no right to demand payment thereon in silver or the equivalent. We are thus left with a contractual arrangement wherein SPC may, and in all probability, due to the 1935 Chinese Decree, must pay on such stock in Shanghai Taels or the currency substituted therefor. On this point SPC has cited three cases.

In the first, Krenov v. West Coast Life Insurance Company, 48 Wash.2d 180, 292 P.2d 209 (1956), it was held that an insured who had purchased an insurance policy in 1933 payable in Shanghai local currency, and who had made premium payments thereafter in the media of exchange current in China at the time was estopped to assert against the insurer that the policy called for payment upon maturity in Shanghai silver dollars as they existed at the time of issuance of the policy or in the present equivalent value of such silver dollars. In Patak v. West Coast Life Insurance Company, No. 641,062, L.A.Super.Ct., June 15, 1956 (unreported), insurance policies were issued in 1931 payable in "Tientsin (China) Local Currency of the Present Weight and Fineness". The Court held that this reference did not make it a commodity contract but that it was actually a contract for the payment of money and as such was not fortified against the power of government which might devalue the money bargained for. It was felt unnecessary to consider estoppel since both parties

had taken the same chance on the uncertainty of the currency for which they contracted. Since the Chinese currency had become worthless, the policies were declared without value.

Finally, there is Sternberg v. West Coast Life Insurance Co., 196 Cal.App.2d 519, 16 Cal.Rptr. 546 (1961) which bears close resemblance to the present case. There the insurer issued life insurance policies to the appellant, a resident of China, during the 1920's. Both the face amount of the policies and the premiums were denominated in Shanghai Taels. The same Chinese decrees and inflationary spiral were involved and considered. Although the insurer had maintained reserves in Chinese currency to meet its liabilities under the policies, the eventual depreciation of the currency rendered the reserves valueless. It can be noted, however, that like here, although the insurer's Chinese reserves had become nil, the insurer was apparently not without other assets. The insurer sought declaratory relief to have the policies declared to be without value, and the trial court so held. The appellate court affirmed, stating as follows at 16 Cal.Rptr. 548, 549:

> "When parties name a specified currency for the payment of an obligation, they know that such a currency falls under the control of the government that issues it, and they realize, too, that the currency is therefore subject to fluctuation. The pages of economic history are filled with the annals of fallen currencies of the past and with the accounts of the rise and demise of media of exchange. Inherent in the idea of money itself lies the power of the sovereign to change its value. Implied in the terms of the parties' contract fixing a designated media for payment lies the correlative recognition that they assume the risks of appreciation or depreciation in the value of the media."

See also, Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1934); Corbin on Contracts, § 1005, p. 52; Mann, The Legal Aspect of Money, (3d ed. 1971) 265–274.

■ While insurance policies are not involved here, I am nevertheless being asked to determine the right to payment under the contractual provisions of the certificate of incorporation of SPC as they apply to the holders of the preferred 6 Tael Stock. As previously noted, the corporate obligation to pay with reference to the stock has narrowed itself down to payment in the Shanghai Tael as it existed at the time the stock was issued, or in such other unit of currency as may, by the time of payment, have been substituted therefor in the geographical area of Shanghai, China. The law seems clear that the parties are bound by the media of exchange that they have chosen, in this case Chinese currency substituted for the Tael.

■ ■ Where suit is brought to ascertain the amount due on a non-commodity obligation expressed in foreign currency, values are determined in terms of United States legal tender money and the rate of exchange is that existing at the time demand is made. Die Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926); Sternberg v. West Coast Life Insurance Co., supra; Corbin on Contracts, § 1005, pp. 47, 49. When the present rate of exchange is applied in a situation where one JMP (the substituted currency) is equivalent to some 2,145 trillion Shanghai Taels, it becomes obvious, in the language of the Court in Patak v. West Coast Life Insurance Co., supra, that "we have no coin in the United States so infinitesimally small" as to pay the obligation.

I am therefore of the opinion that the 6 Tael Stock is presently without value and must be so declared.

In passing, I also acknowledge Judah's reliance on Zahn v. Transamerica Corporation, 162 F.2d 36 (3rd Cir. 1947). There the board of directors elected by Class B stockholders called the Class A

preferred stock for redemption at $80 per share and thereafter liquidated the corporation by distributing the remaining assets to the Class B stockholders. Had the preferred Class A stockholders participated in the liquidation, they would have received some $240 per share. It was held that the call of the Class A stock was voidable in equity under the circumstances.

I feel, however, that Judah's reliance on this case is misplaced. The basis for the decision there was that there was no reason for the redemption of the Class A stock to be followed by the liquidation of the corporation except to enable the Class B stock to profit at the expense of the Class A stock. The same is not true here. The 6 Tael Stock has not been called for redemption to get it out of the way, but rather a judicial determination is being sought because it has no present value even if redemption was to be attempted. There appears to be a reason for the action other than increased benefit to the holders of the common stock.

## II. As To The Debentures

■ In addition to the foregoing inflationary and governmental factors which apply to the 6 Tael Stock, the Debentures involve an additional consideration. As noted, the Debentures were eventually issued in terms of Chinese Silver Dollars. They were to become due in 1973. As a result of the Chinese Decree of 1935 abolishing silver as a form of exchange, SPC contacted its Debenture-holders and requested that, in return for a specified premium, they forego any right to payment in silver as stated in the Debentures. Approximately 99 percent of the Debenture-holders accepted this offer and remitted their certificates so that they could be stamped accordingly. Thus they expressly waived any right to payment of the obligation in silver or its equivalent. Again SPC contends that the eventual treaties in 1943 terminating the extraterritorial status of Shanghai thereby subjected the small

remainder of the Debenture-holders to the same status, and again I feel that this argument has merit. Thus I am satisfied that the holders of the Debentures have no right to demand payment in silver and that their right to payment is limited to the present Chinese currency which has evolved from the Chinese Dollar employed immediately subsequent to the 1935 Decree. Thus, unless there is some other mitigating element, the Debentures are presently of no more value than the 6 Tael Stock.

In an effort to establish some distinguishing feature, Delaware Trust makes several arguments. First, it says that since SPC has lost all of its property through governmental confiscation, and since it has not been involved in the manufacture and supply of power, nor in any other active business endeavor since 1950, it is, in effect, in a state of de facto dissolution. Thus, it is urged, the Court should regard SPC's assets as a trust fund for creditors and order distributions to the Debenture-holders.

Secondly, by analogy to the law of eminent domain, Delaware Trust argues that the sums received from the FCSC award should be considered as compensation for the expropriation of the SPC property and that the lien of the deed of trust indenture given for the benefit of the Debenture-holders should be transferred to the award, thereby breathing value into the Debentures.

Finally, it is argued that "substantial fairness" requires that the Debenture-holders be given an equitable lien on the proceeds of the FCSC award. Delaware Trust contends that the property bound by the deed of trust was intended to protect the Debenture-holders against currency depreciation, that the proceeds from the sale of the Debentures were the generating source of the properties acquired by SPC and that consequently it would be inequitable to hold that the Debentures have no value since the sole owner of the common stock should not be allowed to prevail over such bona fide creditors.

 I do not find these arguments persuasive. To begin with, I do not feel there is sufficient evidence before the Court to hold that SPC is in de facto dissolution. Being relieved of its workable assets, SPC has eventually attempted to recoup something of value through its claims under appropriate legislation. It has been awarded over seven million dollars on one claim and has had its loss set in excess of fifty-three million on another. While severely wounded, it is not dead yet. The mere fact that it has quit doing business does not necessarily constitute a de facto dissolution if it is still solvent. Because of action taken against it, or by reason of pecuniary conditions, a corporation may cease to exist for all practical purposes and yet not be dissolved as a matter of law. 16A Fletcher, Cyc. Corps. (Perm.Ed.1962) § 7967. I cannot conclude that it is in de facto dissolution here.

 As to the eminent domain analogy, the funds that it now has did not derive from the taking of its properties, but rather for damages inflicted upon them by another government during World War II. Under all the circumstances I do not feel that the comparison to a compensated taking for a public purpose is appropriate here.

 Finally, all of the arguments of Delaware Trust, including that of "substantial fairness", miss the thrust of SPC's application. As I interpret it, SPC is asking to have the Debentures declared without value for the reason that their worth in the currency controlling the obligation has become so minute as to make payment impossible, even if United States currency is employed. In fact SPC refers to a specific FCSC ruling in In Re James S. Love (Decision No. CN–457 under the China Claims Act [22 U.S.C. §§ 1643–1643k] June 10, 1970) in which that commission specifically found, in a proceeding brought by a holder of these same SPC Debentures, that the Debentures "were entirely worthless on December 30, 1950". If, because of the factors previously cited herein, the Debentures are worthless, then the issue of whether or not alternative corporate assets have now become security therefor would seem moot.

To acknowledge that the Debentures have no value in the currency in which their obligation is expressed because it is completely deflated, and to then, in the name of "substantial fairness", turn to remaining corporate assets in an effort to work out some equitable value to be placed on them would amount to nothing more, to my mind, than the Court establishing its own independent revaluation for the Chinese currency denominated in the Debentures. In addition to being without any logical beginning rationale for such a task, it would seem to establish a potentially chaotic precedent for a Court to arbitrarily and indirectly give a present value to a media of exchange which, in the monetary world, has none. Consequently, I feel that I have no choice but to declare that the Debentures are also without value.

### III. In Summary

 To reach the foregoing conclusions is not without difficulty. Even though parties who enter into an obligation expressed in a designated currency must assume the risk of fluctuations in its value, it somehow seems unfair to hold that one who has paid for his anticipated consideration in good faith should now be entitled to nothing at all. This result has also bothered the text writers. See Mann, The Legal Aspect of Money (3rd Ed.) 293. Professor Corbin wrestles with the problems as follows at Corbin, on Contracts § 1360:

"Without doubt, persons of average knowledge and experience are now aware of the risk of extraordinary depreciation of money in times of intentional inflation, when governments are bankrupt or conspire to defraud their enemies and the printing presses run wild in a riot of paper money. During such a time, they may properly be held to as-

sume in their ordinary transactions the risks of gain or loss through such inflation, within limitations that will protect the weak and ignorant against the more knowing and skillful speculator. But there is no intentional assumption of such a risk when one purchases an insurance policy or a long term bond. . . . In respect to such bargains as these, inflation does grave injustice, unless by either legislation or judicial action a readjustment of promised payments is made so as to prevent gains and losses that are far out of proportion to the risks supposed to exist at the time the bargains were made."

\* \* \* \* \* \*

"If the facts show that the promisee is left suffering heavy economic loss, while the promisor reaps a correspondingly great profit, the established rules of our legal system do not require such a decision."

As pointed out by Professor Mann, however, this view is unsupported by any authority. Mann, The Legal Aspect of Money (3rd Ed.) 97, n.2. Even Corbin is compelled to refer to cases which have reached a contrary result and in effect, acknowledges that his is no more than a suggestion that a court should make some adjustment if at all possible. He sums up as follows at Corbin, on Contracts § 1360:

> "In making adjustments as suggested in this section, courts must take into consideration the situation of the debtor as well as that of the creditor. Readjustments that are spotty and inconsistent may do more harm than good. At its worst, the problem is too much for either courts or legislatures; but this fact does not justify either one in refusing to make an effort."

To make any effort at equitable adjustment here runs headlong into the plight of the debtor, SPC. Its situation, at least from the present record, warrants consideration. Although it now has several million dollars as a result of its FCSC award, its losses occasioned by the political changes in China appear to be substantial. Its properties, customers, records and business in that country are gone. Its uncompensated loss has been set at more than $53,000,000. This loss has derived from the ouster of the same foreign government whose currency failed to the detriment of the holders of the preferred stock and bonds, and no doubt historians could find a direct relationship between the two. It is hard to say that because of the overall situation it has reaped gains far out of proportion to the loss suffered by its creditors. The elements that to Corbin would dictate an "effort" at equitable adjustment are not here.

Accordingly, and admittedly with some feeling of frustration, the motion of SPC for summary judgment is granted. The belated motion of Judah for summary judgment is denied. Costs are assessed against the Plaintiff Shanghai Power Company. Its counsel are directed to present an appropriate order, on notice, within 30 days.