John WINSTON, Plaintiff,

v.

Leonard S. MANDOR, Robert A. Mandor, Joan Levine, Harvey Jacobson, Gregory McMahon and Geoffrey S. Aaronson, Milestone Properties, Inc. and Concord Assets Group, Inc., Defendants.

Nos. 14807, 15416.

Court of Chancery of Delaware, New Castle County.

Submitted: April 15, 1997.
Decided: May 12, 1997.

Joseph A. Rosenthal of Rosenthal, Monhait Gross & Goddess, Wilmington; Silverman, Harnes & Harnes, New York City, of counsel, for Plaintiff.

Michael Hanrahan and Daniel P. Conneen of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington; Robert W. Gottlieb, and Joel A. Yunis of Rosenman & Colin, L.L.P., New York City, of counsel, for Defendants.

## OPINION

STEELE, Vice Chancellor.

### I. Issue Presented

■ Do controlling stockholders who effectuate the sale of a significant portion of corporate assets, and thereafter distribute the proceeds as a dividend to the common stockholders owe fiduciary duties *vis à vis* these transactions to the corporation's preferred stockholders? I conclude they do not owe fiduciary duties if the transactions are specifically contemplated by the corporate certificate of designations. I further conclude, however, that the corporation, like any contracting party, must interpret and apply the applicable provisions in the certificate in good faith.

### II. Background[1]

Plaintiff is the holder of 3100 shares of Series A Preferred Stock of Milestone Properties, Inc. He brings suit on behalf of all non-defendant holders of the preferred shares against Milestone, each of its individual directors, and Concord Assets Group, Inc. The gravamen of the several complaints filed in these actions is that two of the Milestone directors, Leonard and Robert Mandor, by their control of Milestone's affairs, caused it to engage in a series of related transactions particularly designed to advantage the Man-

---

1. In deciding a motion to dismiss, all non-conclusory factual allegations found on the face of the complaint and any reasonable inferences therefrom are assumed to be true. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1988). Be- cause the two above-referenced actions are consolidated for the purposes of deciding the pending motion to dismiss in each, the facts are drawn from each of the two complaints without specific reference, except where necessary.

dors to the distinct disadvantage of Milestone's preferred stockholders.

Leonard Mandor is the chairman of the Milestone board of directors and its chief executive officer. Robert Mandor is also on Milestone's board and is its president and chief operating officer. Before the transactions complained of here, the two beneficially owned 436,000 shares, or 35.8%, of Milestone common stock. By virtue of their positions and stock ownership, it is alleged the Mandors exercised control over the company. It is further alleged that the four other members of Milestone's board were, by reason of their respective relationships with the Mandors, similarly controlled. Joan LeVine, a member of the board and officer of the company, and her husband who is also an officer of Milestone, both owe their continuing positions at Milestone to the Mandors; Geoffrey Aaronson is an attorney who has represented the Mandors and their business interests; Harvey Jacobson was indebted to the Mandors for $500,000 at the time of the transactions; and Gregory McMahon is an accountant who has performed tax and other services for the Mandors. McMahon was nominated to the board by the Mandors, but elected by the preferred stockholders.

Before October of 1995, Milestone's primary assets and business were the ownership and management of sixteen commercial properties. These properties consisted of single tenant buildings and shopping centers. The first of two closely related transactions complained of by the preferred stockholders concerns Concord Assets. A company wholly owned by the Mandors, Concord is also in the commercial real estate business. Prior to the below-described transactions, Concord's assets consisted of three shopping centers and 35 subordinated notes and mortgages held on 32 other shopping centers. The three shopping centers are heavily indebted and, it is alleged, have insufficient cash flow to meet both mortgage and maintenance/re-

pair obligations. The single tenant at one of the three is in bankruptcy and is not generating sufficient income to meet even the property mortgage obligations. The mortgages on this property and one of the other two were personally guaranteed by the Mandors.

The notes and mortgages were held by Concord by reason of its promotion of real estate tax shelters. The shopping centers were purchased with mortgage money by Concord or other Mandor affiliated entities and then sold to limited partnerships organized by them in return for cash and the notes. The notes carried with them the obligation to pay the primary mortgage and maintenance/repair expenses and the right to receive any remaining income. It is alleged that cash flow on five of the properties was insufficient to meet the mortgage obligations, and that none of the properties generated sufficient cash flow to meet both mortgage and maintenance/repair expenses.

The complaints attack several Milestone actions that, depending upon one's point of view, should be seen as a series of separate transactions or as a series of steps in one transaction.[2] The first transaction was the sale of the Concord assets to Milestone in return for $500,000 cash and 2,544,654 shares of newly issued Milestone common stock. This boosted the Mandor's beneficial holdings to approximately 80% of outstanding common shares. The second transaction was a spin-off of the sixteen original Milestone properties to a subsidiary (Union Properties Investors, Inc.) in return for newly issued UPI common and preferred shares. The third was the distribution of the newly issued UPI shares to Milestone's common stockholders in the form of a dividend.[3]

These transactions were instituted according to a plan developed by LSG Advisors, an investment banking firm retained by Milestone. The Milestone board established the Related Party Transaction Committee to evaluate the fairness of the plan. This com-

---

**2.** For the sake of convenience only, I will refer to each event as a "transaction". I need not nor do I decide, at present, whether these "transactions" are separate and independent transactions or parts of a single transaction.

**3.** Again for the sake of convenience, I will refer to the Milestone property/UPI share exchange and the distribution of UPI shares to the Milestone common stockholders collectively as the "UPI transactions."

mittee was comprised of Aaronson, Jacobson and McMahon from Milestone's board and a group of professional advisors. It is alleged that nearly all of these firms, like the directors, had ties to the Mandors, Milestone and/or Concord. LSG, the committee's financial advisor, was on monthly retainer to Milestone, was to receive a $310,000 fee on completion of the UPI spin-off, and was allegedly promised future work. The committee received its legal advice from a firm defending Concord in suits by some of its limited partnership groups.

LSG's plan was approved by the Milestone board in February 1995, and described in proxy materials sent to Milestone stockholders in September 1995. The proxy statement notified the stockholders of a special meeting at which they would be asked to approve of the purchase by Milestone of the Concord assets. The proxy statement also notified the stockholders that, subject to approval of this transaction, the UPI transaction would be completed. The common stockholders approved the plan and it was completed in October 1995. Preferred stockholders were not entitled to vote on the transactions.

Plaintiff brought suit in January 1996, and by an amended complaint alleged violation of 8 *Del.C.* § 271, for Milestone's failure to subject the UPI transactions to a stockholder vote; breach of several provisions of rights of the preferred stockholders contained in the certificate of designations; and breach of the fiduciary duty of loyalty. The amended complaint sought rescission of the UPI transactions—relief which was foreclosed by the granting, in part, of defendants' motion to dismiss.[4] While the remainder of defendant's motion was *sub judice,* plaintiff filed a second complaint and sought dismissal, without prejudice, of the first. The factual allegations of the second complaint are substan-

tially similar, though it adds as *post hoc* support, details of the recent sale of the once Milestone/more recently UPI properties to a real estate investment trust. The second complaint contains only a single claim for breach of fiduciary duty. Defendants now have moved to dismiss the second complaint or, in the alternative, to stay all proceedings in the second action until resolution of the first. Pending, therefore, is the remainder of defendants' motion to dismiss the first complaint, plaintiff's petition to dismiss it (without prejudice), and defendants' motion to dismiss or stay the second complaint.

### III.  Discussion

Oral argument was heard on 15 April 1997, and on 16 April I issued an order consolidating the two cases for purposes of deciding all pending motions. Plaintiff's claims are addressed in the order presented by the amended complaint of the earlier filed action.

### A.  Section 271

Section 271 requires majority shareholder vote of approval before the corporation may "sell, lease or exchange all or substantially all of its property and assets[.]"[5] Plaintiff contends the UPI transactions constituted such an event, and that no vote was held. The proxy does not appear to seek approval, at least on the face of the selective portions submitted with the current motions, for the exchange (or "transfer") of the original Milestone properties. And the Proxy Statement—Information Statement expressly states that "Stockholder approval of the distribution is not required and we are not asking you for a proxy and you are requested not to send us a proxy with respect thereto."[6]

Defendants raise three arguments in opposition to plaintiff's contention: 1) distribution of assets to a subsidiary corporation is not a

---

4. *See Winston v. Mandor,* Del.Ch., C.A. No. 14807, Steele, V.C., 1996 WL 936161 (Oct. 25, 1996), Mem.Op.

5. 8 Del.C. § 271 (1983) ("Sale, lease or exchange of assets; consideration; procedure.").

6. Notice and proxy statement attached as Exh. A to Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss [Pl.'s First Cmpl.] ("Pl.'s Mem. in Opp. 1").

Documents appended to the parties' briefs in support or in opposition to a motion to dismiss are properly considered if they are incorporated by reference in the complaint or if not relied upon for the truth of their contents. *See Vanderbilt Income Growth Assocs., L.L.C. v. Arvida/JMB Mgrs., Inc.* Del.Supr., 691 A.2d 609, 612–13 (1996).

sale, lease or exchange under the terms of section 271; 2) the distribution did not include, in any event, all or substantially all of Milestone's assets; and 3) since the preferred stockholders were not entitled to vote on the transaction, plaintiff has no standing to assert a claim under this section. Since the last of the three raises a threshold jurisdictional issue, I address it first.

■ Fundamentally, determination of a plaintiff's standing to sue for a statutory violation must be made by reference to the provision at issue.[7] The statute here at issue indicates a corporation may sell or otherwise dispose of its assets "as authorized by a resolution adopted by a majority of the outstanding stock of the corporation entitled to vote thereon[.]"[8] It follows that only persons so entitled may complain about a violation of the statute. This is not to say that the same events may not cause some other harm; only that the non-voting plaintiff may not seek redress on the basis the statute is violated. Plaintiff's standing turns, therefore, on whether he would have been entitled to vote on the UPI spin-off and distribution, assuming such a vote were required by section 271.

■ As a starting proposition, all of the corporation's shares are equal and entitle the holders to enjoy the same attendant rights and privileges.[9] The corporation may limit the rights (including the right to vote) of holders of a preferred or other particular class of shares by express limitation in its certificate of incorporation, a specific certifi-

cate of designations or other form of resolution.[10] When the corporation so chooses, the shareholders' rights are circumscribed as set forth in that instrument.[11] In the present case, therefore, the question of plaintiff's standing may be resolved by looking to the "Certificate of Designations of $.78 Convertible Series A Preferred Stock of Milestone Properties Inc." (the "Certificate").[12]

"Except as set forth in subparagraphs (b) and (c) of this paragraph 5 or otherwise required by law, holders of Series A Preferred Stock shall have no right to vote at, or participate in, any meeting of stockholders[.]"[13] Neither of the subparagraph exceptions are applicable to the immediate issue. Thus, unless the vote of the preferred shareholders was legally required, plaintiff would not have been entitled to vote, and does not have standing to challenge Milestone's failure to seek shareholder approval of the UPI transactions. Plaintiff has not cited, nor am I aware of, any such legal obligation.

This should end the matter, but plaintiff argues that defendant's failure to obtain approval from shareholders entitled to vote is "a violation of a fundamental statutory right[.]" As I interpret this argument, it is that anyone alleging harm from the acts on which the vote allegedly should have been taken must have standing to sue for violation of section 271. This alleged fundamental right, and what one might extrapolate as the underlying corporation law policy of full stockholder participation in any such transac-

---

7. See, e.g., Oceanport Indus., Inc. v. Wilmington Stevedores, Inc., Del.Supr., 636 A.2d 892, 900 (1994) (standing to appeal decision of administrative agency hinges on interpretation of statutory language conferring right to do so).

8. 8 Del. C. § 271.

9. See Shanghai Power Co. v. Delaware Trust Co., Del. Ch., 316 A.2d 589, 593 (1974). See also 8 Del.C. § 212(a) (1983) ("Voting rights of stockholders; proxies; limitations.").

10. See 8 Del.C. § 151(a).

11. See Moore Bus. Forms, Inc. v. Cordant Holdings Corp., Del. Ch., C.A. No. 13911, Jacobs, V.C. (Nov. 2, 1995), 1995 WL 662685 at *6.

12. Attached as Exh. A to Defs.' Opening Brief in Support of their Motion to Dismiss [pl.'s first

complaint] ("Defs.' Op. Br. 1"). As stated in note 6, above, review of documents incorporated in the complaint is appropriate on a motion to dismiss. Because the rights attendant to ownership of Milestone preferred stock are set forth in the Certificate and several of the plaintiff's claims rely upon its provisions, I consider the Certificate integral to and thus incorporated into the complaints. See Vanderbilt Income, supra, at 612–13; In re Santa Fe Pacific Corp. Shareholder Litig., Del.Supr., 669 A.2d 59, 69–70 (1995). I consider the Certificate, however, only to the extent it is clear and unambiguous, and will not resolve issues of construction (if there be any) on the present motion.

13. Certificate ¶ 5(a).

tion, is only and best served, plaintiff argues, by an inclusive rather than exclusive application of the standing doctrine. In support of this argument plaintiff cites what he claims is an analogous case, *Kaplan v. Peat, Marwick, Mitchell & Co.*[14] In that case, a derivative plaintiff challenged the defendant's standing to raise as a defense the plaintiff's failure to comply with the demand requirements of Court of Chancery Rule 23.1. Vice-Chancellor Jacobs turned first to the important governance issues and policies underlying the demand requirement, concluding they would be better served by allowing a non-corporate defendant to assert the defense.[15]

Section 271 defines the class of persons it wishes to protect by requiring the vote of those shareholders entitled to vote as opposed to all shareholders. Additionally, the underlying corporation law policy is better served in this instance by restricting standing to sue under section 271 to this class. That is, a Delaware corporation may structure the rights and obligations by and among itself and its shareholders through the issuance of special classes of stock. Where not otherwise prohibited by statute or public policy, the corporation may limit or expand such rights as it sees fit. Section 212 of the Delaware General Corporation Law embodies this policy, and the language of section 271 reflects it by requiring the approval of voting shareholders rather than shareholders more generally.

I conclude plaintiff has no standing to sue for violation of section 271. Accordingly, this claim is dismissed.

## B. Breach of the Certificate

Plaintiff claims the exchange of the original Milestone properties to its subsidiary UPI and the subsequent distribution of UPI shares to the Milestone common shareholders triggers two provisions in the Certificate. Under the first provision, subsection 6(d), plaintiff allegedly has the right to convert his preferred shares into UPI shares. Under the second, subsection 6(b)(3), plaintiff is entitled to a good faith conversion adjustment valuation.[16] Defendant disputes the UPI transaction triggers subsection 6(d), and disputes plaintiff got anything less than what is called for by subsection 6(b)(3).

The Certificate, setting forth the rights and obligations between plaintiff and Milestone with respect to these claims, defines the relationship as a contractual one.[17] Plaintiff's claims thus sound in contract. In order to survive a motion to dismiss, plaintiff must demonstrate the existence of the contract, breach thereof and resultant damage.[18] There being no dispute about the first of these elements, I proceed to the second.

### 1. Section 6(d)

■ As with any contractual dispute, the starting point is the language of the contract. In relevant part, subsection (d) of section 6 states:

*Consolidation or Merger.* In case of ... the sale, transfer or other disposition of all or substantially all of the property, assets or business of the Corporation as a result of which sale, transfer or other disposition, property other than cash shall be payable or distributable to the holders of the Common Stock, each share of Series A Preferred Stock shall thereafter be convertible into the number and class or series of shares or other securities or property of the Corporation, ... to which such sale, transfer or other disposition shall have been made, to which the Common Stock otherwise issuable upon conversion of such share of Series A Preferred Stock would have been entitled upon such ... sale, transfer or other disposition if outstanding at the time thereof[.]

---

**14.** Del.Ch., 529 A.2d 254 (1987), *aff'd in part and rev'd in part,* 540 A.2d 726 (1988).

**15.** *Id.* at 259.

**16.** I do not agree with defendants that plaintiff's assertion of claims for breach of both provisions are inconsistent. As more fully described below, subsection 6(d) is elective, and thus, in some circumstances, either right will be available.

**17.** *See Jedwab v. MGM Grand Hotels, Inc.,* Del. Ch., 509 A.2d 584, 593 (1986).

**18.** *Moore Bus. Forms, supra,* at 7.

As I read the provision, it grants the preferred shareholders the right, but does not impose the obligation, to convert their preferred shares into a new security in the event Milestone transfers or otherwise disposes of substantially all of its assets and distributes the resulting proceeds, in a form other than cash, to the common stockholders. Plaintiff argues the UPI transactions fall squarely within the parameters of the provision. Defendants pose several very different understandings of the transactions and subsection 6(d).

Defendants' first argument begins with notion that the exchange of the original Milestone properties for the UPI shares is a transaction wholly separate from subsequent distribution of UPI shares to the common stockholders. Considered independently, defendants argue, neither transaction triggers subsection 6(d). Thus, "[t]he distribution simply put properties into UPI—it did not make the UPI stock payable or distributable to the holders of Milestone common stock[;]" and "a dividend paid to Milestone's common stockholders is not a sale, transfer or other disposition of Milestone property that triggers the anti-destruction clause of Section 6(d)." [19]

■ Defendants rely upon the doctrine of "independent legal significance," which holds that acts of the corporation taken in compliance with the provisions of one section of our General Corporation Law need not be tested against the requirements of another, though the result be the same.[20] I begin by assuming, for the sake of argument, the relevance of this doctrine to the Certificate provision.[21] Defendants' application of the doctrine to

these transactions is as follows: The distribution of the Milestone properties to UPI in exchange for UPI common and preferred stock is authorized and in compliance with the provisions of 8 *Del. C.* §§ 122(4), 123; [22] the distribution of the UPI shares to the Milestone common shareholders is authorized by 8 *Del. C.* §§ 170, 173; [23] that one or the other or both of Milestone's actions may constitute a sale of assets under 8 *Del. C.* § 271 is therefore not relevant.

There are two immediate difficulties with this argument. First, whether statutory provisions defining the outer limits of a Delaware corporation's authority may be relied upon to avoid other statutory provisions placing limits on the manner in which those powers may be exercised, is an uncomfortable proposition. For example: If defendants' reliance upon section 122(4) is proper and sufficient in this instance, when must a corporation comply with the requirements of section 271?[24] Second, it is not altogether clear nor am I prepared to resolve, from the face of the selective proxy materials submitted with the motions, all factual circumstances necessary to determine definitively whether the events must be considered as one or more transactions. Accordingly, for the remainder of the discussion I accept plaintiff's assertion that the UPI transactions constitute a single transaction in satisfaction of subsection 6(d) of the Certificate.

■ Defendants' second argument is that subsection 6(d) "is only triggered in the event that the common stock into which the preferred stock would normally convert [is]

19. Defs.' Op.Br. 1 at 23, 24.

20. *See Orzeck v. Englehart,* Del.Supr., 195 A.2d 375, 377 (1963).

21. I make this assumption as a practical expedient, because neither parties' subsection 6(d) arguments are otherwise predicated.

22. In relevant part, section 122 and its subsection 4 read: "Every corporation created under this chapter shall have power to: ... sell, convey, lease, exchange, transfer or otherwise dispose of, or mortgage or pledge, all or any of its property and assets, or any interest therein[.]" Section 123, generally speaking, provides that a

Delaware corporation shall have the authority to buy, sell, receive, and etc., the stock or securities of another corporation, and to exercise and/or fulfill all attendant rights and/or obligations.

23. Both sections describe and define the corporation's authority to declare and pay dividends.

24. *But see Orzeck, supra,* 195 A.2d 375 (shell corporation may purchase all shares of several independent corporations without complying with merger statute requirements where all corporations retained independent identities and where authority is otherwise conferred by section 123 *per* doctrine of independent legal significance).

no longer in existence."[25] Since Milestone common shares remain in existence defendants conclude plaintiff has no right to convert into UPI shares. In support, defendants rely primarily on *Wood v. Coastal States Gas Corp.*[26]

*Coastal States* involved a challenge by preferred shareholders to a complex litigation settlement. As part of the settlement, the parent company, Coastal States Gas Corp., spun off a significant subsidiary business, giving minority amounts of its common and preferred stock to a trust, and distributing the remainder to Coastal's common stockholders. Plaintiffs in *Coastal States,* holders of Coastal preferred shares, brought suit under a similar certificate anti-dilution/-destruction provision, charging that the spin-off was part of a recapitalization. The Supreme Court affirmed a post-trial Court of Chancery conclusion that the spin-off was not a recapitalization within the meaning of the provision.[27] In so doing, the Supreme Court agreed with the Court of Chancery that "[s]ince the Coastal shares will continue in being after the spin-off, . . . the plan is not a recapitalization within the meaning of the Certificate."[28] In reaching this conclusion, both focused on the language of the certificate: "In the event that the Corporation shall be recapitalized, . . . [the] Preferred Stock may thereafter receive in lieu of the Common Stock otherwise issuable to him upon conversion. . . ."[29] Defendants point to similar language in the Milestone Certificate and would have me extrapolate a bright line rule: such provisions are not triggered unless the common stock is extinguished by the event at issue.

I do not read *Coastal States* to stand for such an expansive proposition. *Coastal States* decided that the common stock must be extinguished before the event could be considered a recapitalization under the language of that certificate. It did not decide that similar language must be read as *sine*

qua non rule applicable to such provisions generally. The Supreme Court's decision goes no further than to affirm the Court of Chancery's finding that, for purposes of interpreting that particular anti-dilution/-destruction clause, a recapitalization not extinguishing the common shares or otherwise involving an immediate threat to the preferred shares does not trigger the provision.[30] As such, *Coastal States* does not control the result in this case.

This conclusion does not, however, answer the more immediate relevant question whether the similar language in the Milestone Certificate may be read to impose such a requirement in the context of a sale of assets. I do not find any such precondition in subsection 6(d). The language in the Milestone Certificate similar to that of the certificate in *Coastal States* reads: ". . . each share of Series A Preferred Stock shall thereafter be convertible into the number and class or series of shares [of the new corporation] . . . to which the Common Stock otherwise issuable upon conversion of such share of Series A Preferred Stock would have been entitled upon such . . . sale, transfer or other disposition if outstanding at the time thereof[.]" I do not read this language as imposing a *sub silentio* requirement that the common stock must be extinguished before the subsection comes into play. Rather, the language spells out the means by which the shares (or other securities) of the new corporation are to be measured against the original common shares (extant or not) for the purposes of conversion. Even if this were not clear from the very language quoted above and the terms of the provision generally, though I find it to be, this reading is the most logical. A transaction in which the corporation sells all or substantially all of its assets, as opposed to a merger (or perhaps a recapitalization), surely includes the possibility that the corporation or some part of it survives, and so too its shares.

**25.** *Id.* at 25.

**26.** Del.Supr., 401 A.2d 932 (1979).

**27.** *Id.* at 940.

**28.** *Id.* at 939.

**29.** *Id.* at 938; *Wood v. Coastal States Gas Corp.,* Del.Ch., C.A. No. 5719, Hartnett, V.C. (Nov. 9, 1978), 1978 WL 2514 at *4.

**30.** *See Coastal States,* 401 A.2d at 940.

■ The remaining question regarding plaintiff's claim for breach of subsection 6(d) is whether Milestone has sold "all or substantially all" of its assets. Since I find no commonly accepted definition, and since 8 Del.C. § 271 uses the same phrase, I look to the case law interpreting the section for guidance. The Supreme Court has long held that determination of whether there is a sale of substantially all assets so as to trigger section 271 depends upon the particular qualitative and quantitative characteristics of the transaction at issue.[31] Thus, the transaction must be viewed in terms of its overall effect on the corporation, and there is no necessary quantifying percentage.[32] Such an enquiry is factual in nature, requiring acceptance of plaintiff's well pleaded allegations over defendants' contradictory contentions.

Plaintiff alleges Milestone has sold substantially all of its assets from both a qualitative and a quantitative view. Qualitatively, Milestone's primary business is now the holding of real estate related securities and mortgages rather than the ownership and management of real property. Additionally, for the six months ending June 1995, the sixteen original Milestone properties constituted its only income-generating assets. On the numbers, plaintiff claims these properties represented 60% of Milestone's net assets, prior to the Concord acquisition. Defendants dispute plaintiff's numerical calculations and argue that "Milestone remains engaged in various

real estate related activities."[33] Despite defendants' invitation to resolve both necessary aspects of the enquiry on the face of their selective proxy package attachments, I decline to do so. Plaintiff's allegations are more than merely conclusory, and so the present motions are not appropriate for the determination of which parties' financial presentations and characterizations more accurately measure the value of the properties or transactions. Accordingly, defendants' motion to dismiss plaintiff's claim for breach of subsection 6(d) of the Certificate is denied.

## 2. Subsection 6(b)(3)

■ This provision of the Certificate provides that upon distribution of other than a cash dividend to the common stockholders, preferred stockholders are entitled to an adjustment of their conversion ratio. In other words, the preferred holders are entitled to convert their shares to an increased number of common shares reflecting (in some measure) the assets of the corporation given to the common holders. The adjustment must be made according to a formula, one variable of which is the "fair market value (as determined by the Board of Directors of the Corporation, whose determination shall be conclusive) of the portion of the assets ... so distributed[.]"[34] Following the distribution of the UPI common stock to the Milestone common stockholders, Milestone made such an adjustment. Plaintiff claims, however,

---

31. See *Thorpe v. CERBCO, Inc.*, Del.Supr., 676 A.2d 436, 444 (1996) (citing *Oberly v. Kirby*, Del.Supr., 592 A.2d 445, 464 (1991) as setting forth the standard by which to determine whether sale is of substantially all corporate assets and thus requiring shareholder approval *per 8 Del.C. § 271*).

32. See, e.g., *Thorpe v. CERBCO, Inc.*, Del.Ch., C.A. No. 11713, Allen, C. (Aug. 9, 1995), 1995 WL 478954 at *9, *rev'd on other grounds*, 676 A.2d 436 (1996) (68% sale effecting "radical transformation" of corporation's business triggers § 271); *BSF Co. v. Philadelphia Nat'l Bank*, Del.Supr., 204 A.2d 746 (1964) (75% of "only substantial income producing *assets*" triggers § 271); *Katz v. Bregman*, Del.Ch., 431 A.2d 1274, 1276 (1981) (sale of 51% of assets generating between 35% and 52% of corporation's income over previous five years and change from steel drum to plastic drum manufacturing triggers § 271); *Gimbel v. Signal Cos.*, Del.Ch., 316 A.2d 599, 606, *aff'd*, 316 A.2d 619 (1974) (sale of 26%

of assets generating 15% of income insufficient to trigger § 271). Of course, it will certainly be true that the percentage may be *so small* as to be insufficient as a matter of law. But that is not the case here.

33. Defs.' Reply Br. 1 at 5–8.

34. The adjustment formula calls for the number of common shares into which a single preferred share was previously convertible ("A") to be multiplied by a fraction. The numerator of this fraction is the market price per share of Milestone common on the date of the distribution ("B"), and the denominator is B minus the then fair market value of the assets ("C"). Thus, A times B divided by (B minus C). For a more detailed examination of the application of a very similar formula, *see HB Korenvaes Invs., L.P. v. Marriott Corp.*, Del.Ch., C.A. No. 12922, Allen, C. (July 1, 1993), 1993 WL 257422 at *14 ("*Korenvaes II* ").

that Milestone was required to make its fair market value determination in good faith and did not do so. Defendants raise two arguments against this claim. The first is that the scope of plaintiff's rights and Milestone's obligations under this provision are determined by its language, and the language provides that the Milestone board's determination is conclusive. The second of the arguments is that, even if the provision contains an implicit requirement to recalculate the conversion ratio in good faith, plaintiff has not pleaded sufficient allegations to sustain such a charge.

■ I reject defendants' first argument altogether. It is a fundamental tenet of contract law that a party must perform their obligations in good faith.[35] The second question requires only a moderately more lengthy discussion. This is because in *Desert Equities, Inc. v. Morgan Stanley Levg'd Equity Fund, II, L.P.,* our Supreme Court held that "[s]ince bad faith is an issue of fact, the issue cannot be resolved on pleadings which, on their face, allege bad faith."[36] After concluding that allegations of bad faith need not meet the heightened pleading standards of Court of Chancery Rule 9(b), the Court reinstated plaintiff's claim that the defendant general partner had not acted in good faith in its execution of a partnership agreement provision.[37] The relevant part of plaintiff's complaint, quoted in full in the Supreme Court opinion, contained only facts related to the alleged act taken in bad faith, and a plausible motivation for it.[38] Plaintiff in this case has fulfilled these requirements. Plaintiff alleges that Milestone's determination of the fair value of the UPI common stock distributed to its common stockholders was not made in good faith, that it chose an interested party to perform the valuation, and that the controlling shareholders of Milestone would benefit by an undervaluing of the distributed assets.

It is certainly true, as defendants argue, that they are not required to follow or perform any particular valuation procedure, and may choose whatever firm they wish. However, whatever method they choose they must do it with the same fairness and decency as is incumbent upon all contracting parties. It is also true that the terms of subsection 6(b)(3) clearly limit the assets subject to fair market valuation to those distributed to the Milestone common stockholders. As such, it is the UPI common stock alone that Milestone is required to fairly value. Though any fair valuation of the UPI common stock may require consideration of the UPI preferred stock held by Milestone and/or° the value of any assets then held by UPI, defendants are not required to employ plaintiff's valuation criteria or methodology, so long as they fulfill this part of the bargain in good faith. Defendant's motion to dismiss plaintiff's claim for breach of subsection 6(b)(3) of the Certificate is denied.

## C. Breach of Fiduciary Duty

Plaintiff alleges several claims for breach of fiduciary duty in its two complaints. The amended complaint in the first action contains two claims under this rubric. The first is that the Concord and UPI transactions were timed so as to benefit the common stockholders at the expense of the preferred stockholders. The second is that the interestedness of the Mandors and the board committee imposed upon them a duty of entire fairness *vis à vis* all Milestone stockholders other than the Mandors. As to the second complaint, I agree with defendants that the single fiduciary duty claim adds nothing other than a more succinct recitation of the same theories, and therefore address it with those of the first action. For reasons apparent from the discussion immediately following, I address the claims by transaction rather than cause of action.

### 1. UPI transactions

■ Before considering whether plaintiff has sufficiently alleged a breach of fiduciary duty with respect to the UPI transactions, the necessary preliminary question

---

35. *See Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d 1050, 1054 (1984), *aff'd,* 575 A.2d 1131 (1990) (citing 5 *Williston on Contracts* § 670 (3d ed. 1969)).

36. Del.Supr., 624 A.2d 1199, 1209 (1993).

37. *Id.*

38. *Id.* at 1208.

of the existence of the duty must be answered. As noted above, the corporation's duties and obligations to preferred stockholders include fiduciary responsibilities where their acts extend beyond the bounds of the contractual relationship created by the certificate.[39] When, however, the corporate actions complained of are expressly contemplated by a certificate, the duties and obligations of the corporation and its preferred stockholders are governed exclusively by their contract.[40] And so it is here.

The UPI transactions, no matter what aspects plaintiff chooses to highlight, involved the sale of Milestone assets in return for UPI stock, most of which was given as a dividend to the Milestone's common stockholders. The contractual provisions discussed above deal squarely with plaintiff's rights and remedies for these acts.[41]

As discussed, however, Milestone has an obligation to interpret and apply those provisions fairly. Thus, as plaintiff properly points out,[42] the transactions may not be structured so as to circumvent or render meaningless the protections afforded by the Certificate.[43] Any claim for the breach of such obligation, however, is contractual rather than fiduciary. Thus, with respect to claims attacking the UPI transactions, plaintiff's remedy must come by challenge to defendants compliance with the provisions of the Certificate.

### 2. The Concord transaction

 The starting point of the transactions discussed above was Milestone's purchase of certain Concord assets in exchange for newly issued Milestone common stock.

Plaintiff asserts that the value of the stock Milestone issued in payment for the Concord assets greatly exceeded what Milestone received in return. The effect of the exchange, plaintiff argues, was to improperly dilute the value of all Milestone stock, common and preferred.

I agree with defendants that this must be considered a derivative claim. The crux of these allegations is that Milestone overpaid for the Concord assets. This alleges waste of corporate assets, and as such is a classic derivative claim.[44] Despite plaintiff's contrary assertions, all Milestone stockholders were similarly injured.[45]

Because plaintiff's complaints do not contain the necessary allegations to pursue this claim, it is dismissed. Plaintiff is, however, granted leave to amend the surviving complaint accordingly, should he wish to do so.

### IV. Conclusion

Following from the conclusions above, plaintiff's remaining claims are contractual, and thus solely against Milestone rather than its directors or Concord. Plaintiff's statutory and fiduciary duty claims are dismissed. Plaintiff's claims for breach of the Certificate may be maintained. Accordingly, defendants' motion to dismiss the first-filed complaint (C.A. No. 14807) is **granted in part and denied in part.** Defendants' motion to dismiss the second-filed complaint (C.A. No. 15416) is **granted.**

---

39. *Jedwab*, Del.Ch., 509 A.2d at 594.

40. *See HB Korenvaes Invs., L.P. v. Marriott Corp.*, Del.Ch., C.A. No. 12922, Allen, C. (June 9, 1993), 1993 WL 205040 at *6 ("[I]t is only necessary to demonstrate that the tailored terms of the certificate, which define the nature of the property owned, govern the propriety of the proposed transaction.").

41. *See id.* (transfer of parent assets to subsidiary and distribution of stock to common stockholders covered by conversion and adjustment provisions of certificate thus limiting preferred stockholders to contractual claims).

42. Pl.'s Opp.Br. 2 at pp. 21–22.

43. *See Korenvaes II*, 1993 WL 257422 at *14.

44. *See In re Brae Shareholders Litig.*, Del.Ch., C.A. No. 11348, Chandler, V.C. (May 15, 1991), 1991 WL 80213 at *4.

45. To the extent, if at all, Milestone stock was diluted by the purchase of the Concord assets, the Mandors' pre-transaction holdings were similarly affected. That they may have made up for the resulting dilution on the other side of the transaction does not change the fact. *See In re Tri–Star Pictures, Inc., Litig.*, Del.Supr., 634 A.2d 319, 330 (1993) (individual claim must allege injury particular to plaintiff and not suffered by all stockholders generally).