## IN THE COURT OF COMMON PLEAS OF THE STATE OF DELAWARE
## IN AND FOR SUSSEX COUNTY

JACQUELINE CHANNELS,                )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )        C.A. No. CPU6-15-000167
                                    )
TROY DESHIELDS,                     )
                                    )
        Defendant.                  )

Tasha M. Stevens, Esq., Attorney for Plaintiff.

William B. Wilgus, Esq., Attorney for Defendant.

Submitted: June 13, 2018
Decided: August 6, 2018

## DECISION AFTER TRIAL

This is a breach of contract action involving the allegedly unworkmanlike construction of a pole building. The Court held a bench trial on June 13, 2018, and at the close of trial reserved decision.

## FACTUAL BACKGROUND

The testimony and exhibits presented at trial establish the following. From 2007 to 2012, Plaintiff Jacqueline Channels owned and operated a hair salon in Millsboro, Delaware. In December 2012, Ms. Channels closed the business, intending to operate a salon out of her home in Millsboro.

In furtherance of her intention, Ms. Channels contacted Sussex County, received permission to operate a salon out of her home, and began looking for a contractor to build a structure where she would operate her salon. First, Ms. Channels contacted Delmarva Pole

Buildings, but the price was too high. Some time later, Ms. Channels saw a sign in a yard for Deshields Construction, the business name used by Defendant Troy Deshields.

*Discussions Between Ms. Channels and Mr. Deshields*

Ms. Channels testified that she was not certain regarding when she first contacted Mr. Deshields, but it was in 2013, possibly June. Ms. Channels and Mr. Deshields spoke twice on the telephone prior to meeting in person. The content of the parties' conversations, both on the telephone and in person, is extrinsic evidence[1] that forms the basis of Ms. Channels' argument that Mr. Deshields agreed to build Ms. Channels a salon and, therefore, the parties' written agreement should be read in that light.

According to Ms. Channels, she informed Mr. Deshields more than once, first during their telephone conversations and later when they met in person, that she wanted to operate a salon out of her home and she wanted to know whether Mr. Deshields could build her a salon. Ms. Channels testified that Mr. Deshields affirmed that he would build her a salon. Inez Davis, Ms. Channels' mother, also testified that Mr. Deshields affirmed to her after construction began that he would build Ms. Channels a salon.

Mr. Deshields testified that he only builds pole buildings, and although he was aware that Ms. Channels wanted to operate a salon out of the structure she wanted built, Mr. Deshields testified that he did not agree to build Ms. Channels a salon. According to Mr. Deshields, Ms. Channels would finish turning the pole building he would build into a salon some time in the future, i.e. after Mr. Deshields finished construction of the pole building. As described by Mr. Deshields, the process of turning a pole building into a salon would require substantial additional

---

[1] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997) ("In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.").

work beyond the construction of a pole building, such as the installation of insulation, interior wall surfaces, and electrical wiring.

When Ms. Channels and Mr. Deshields met in person, Mr. Deshields showed Ms. Channels his advertisement in the Sussex Guide as an example of the kind of buildings he constructs. Mr. Deshields identified Defendant's Exhibit 1 as his advertisement in the Sussex Guide. The advertisement prominently features the text "DESHIELDS POLE BUILDINGS" and shows pictures of the exteriors of pole buildings. The pictures are of various sizes, colors, and types of trim, but almost all the pictured pole buildings have garage or barn doors in addition to typical residential entry doors.

Ms. Channels testified that Mr. Deshields showed her an advertisement for Deshields Construction, but she denied ever seeing Defendant's Exhibit 1. Nevertheless, Ms. Channels testified that the advertisement Mr. Deshields did show her pictured a garage. In relation to the advertisement, Ms. Channels testified that she informed Mr. Deshields she did not want a garage and that Mr. Deshields affirmed he could build her a salon.

The parties did not sign a contract during this first in-person meeting.

*The Contract*

In November 2013, Ms. Channels contacted Mr. Deshields again to move forward with the project, and on November 14, 2013, Mr. Deshields again came to Ms. Channels' home. Mr. Deshields brought with him the form contract used by him for all of his business.

The form contract is a single page and states prominently in bold "CONTRACT TO PERFORM LABOR AND MATERIALS NECESSARY FOR COMPLETION OF POLE BUILDING." The form contract contains spaces to fill out the size of the pole building and the payment schedule for the project. Underneath a specifications heading, the form contract sets forth

3

specifications for the pole building in a series of boxes. Some of the specifications have options (e.g. a 4-inch or 6-inch concrete pad), and some of the specifications are set (e.g. the pole building will have 29-gauge metal walls).

Mr. Deshields went over the form contract with Ms. Channels, and Mr. Deshields and Ms. Channels filled out the form, handwrote certain terms, and signed it (the "Contract").[2] Ms. Channels filled in her name, address, and phone number and wrote the term "buying own door for back" on the Contract. Mr. Deshields filled out the remainder of the form and wrote the other handwritten terms in the Contract.

The unambiguous terms of the Contract provide that: Mr. Deshields will build Ms. Channels a 30x40 foot pole building (the "Pole Building"); and Ms. Channels will pay Mr. Deshields $18,100, consisting of a $5,000 deposit, $9,000 after the trusses are set, and a $4,100 balance due on completion. As previously explained, the specifications for the Pole Building are set forth in a series of boxes. These boxes contain minimal text, rather than full sentences, and Mr. Deshields testified without objection as to the precise meaning of these condensed terms.

Similar to the technical specifications for the Pole Building, the handwritten terms are not written out in full sentences, and except for the handwritten term "insulat [sic] WALLS," there is no particularized dispute regarding the meaning of the handwritten terms. For example, there is no dispute that the partially illegible handwritten term located on the right just above the specifications boxes—which might read "bReezeway incl."—provides that Mr. Deshields' duties under the Contract include construction of a breezeway connecting the Pole Building to Ms. Channels' house (the "Breezeway").

---

[2] Joint Exhibit 1.

As to the "insulat[sic] WALLS" handwritten term, Mr. Deshields testified that he wrote that on the Contract some time during construction. According to Mr. Deshields, Ms. Channels informed him during construction that she expected insulation in the walls of the Pole Building. One of the Contract's specifications boxes states "**INSULATION** YES OR NO." The "YES" is circled and handwritten next to the box is "R." Mr. Deshields testified that he informed Ms. Channels that, while there would be insulation in the roof, under his understanding of the terms of the Contract there would not be any insulation in the walls of the Pole Building. Notwithstanding his understanding of the Contract requirements, Mr. Deshields agreed to install insulation in the walls and wrote "insulat[sic] WALLS" on the Contract to reflect his agreement. Mr. Deshields testified that this agreement did not include the installation of drywall in the Pole Building.

Ms. Channels testified that Mr. Deshields wrote "insulat[sic] WALLS" on the Contract at the time it was signed but did not testify regarding the particular meaning of that term, other than to testify that it was her expectation that the Pole Building would have insulation and an interior wall surface, such as drywall. Ms. Channels did not testify that Mr. Deshields specifically represented that the walls would have an interior surface or finish.

*Construction Begins*

Although the Contract provides for a December 6, 2013 start date, Mr. Deshields delayed the start of construction—with Ms. Channels' consent—until the beginning of April 2014 due to inclement weather. Initially, Ms. Channels felt that the construction was proceeding pretty well. Mr. Deshields came to property with four to five workers and work proceeded. Ms. Channels became concerned regarding the construction after the Sussex County inspector, William Godwin, Jr., came out to the property.

5

At the end of April or the beginning of May 2014, Mr. Godwin, an employee of the Sussex County Assessment Department, came to Ms. Channels' house to perform a "final" inspection on the Pole Building. Immediately upon arrival, Mr. Godwin noticed a problem. The permit application submitted by Mr. Deshields to Sussex County listed the proposed use of the building as a "detached garage." Because the Pole Building does not have a garage door and, therefore, did not appear to be a garage, Mr. Godwin asked both Ms. Channels and Mr. Deshields what the actual intended use for the building was. Ms. Channels informed Mr. Godwin that she intended to use the Pole Building as a salon, and Mr. Godwin instructed Ms. Channels that a salon permit would require a detailed scale drawing of the proposed salon building, including the placement of hair dryers, sinks, cutting chairs, etc.

In response to his directions, Mr. Godwin testified that Mr. Deshields expressed his willingness to do whatever was necessary to complete the project, and a few weeks later, Ms. Channels submitted prints to Sussex County detailing the intended layout of the salon.[3] Prior to her conversation with Mr. Godwin, Ms. Channels was not aware that the permit Mr. Deshields submitted to the County listed a detached garage as the intended purpose of the Pole Building.

Based on the lack of proper permit, Mr. Godwin testified that the Pole Building and Breezeway "failed" inspection. Mr. Godwin did not testify as to the presence or absence of any other factors that might have resulted in the Pole Building or Breezeway either passing or failing inspection had the structures been properly permitted. However, Mr. Deshields testified that the Breezeway also failed inspection because it did not have the proper type of drywall in the Breezeway and because there needed to be tape around the windows.

---

[3] Plaintiff's Exhibit 3.

6

Consistent with Mr. Godwin's testimony, Mr. Deshields testified that after the Pole Building failed inspection he was ready and able to fix the issues identified by Mr. Godwin and complete the project. Ms. Channels testified that Mr. Deshields was angry that the Pole Building failed inspection and stormed away from the conversation with Mr. Godwin. Further, Ms. Channels testified that, when she asked Mr. Deshields why he submitted a permit for a garage, Mr. Deshields stated that he did not know why and that, if she wanted a salon, Ms. Channels would have to submit the permit herself. Mr. Deshields testified that he submitted the original permit as a detached garage permit because Ms. Channels already had a permit for a breezeway, and in Mr. Deshields opinion, considered together those two permits would cover the Pole Building and the Breezeway.

*Construction Following Mr. Godwin's Inspection*

According to Ms. Channels, Mr. Deshields never personally returned to the property following Mr. Godwin's inspection. Nevertheless, Ms. Channels admitted that Mr. Deshields continued to send workers to the site and significant work was completed following Mr. Godwin's visit, including pouring the concrete pad and installation of the roof for the Pole Building.

Ms. Channels testified that she asked the workers where Mr. Deshields was and attempted to call Mr. Deshields, leaving messages regarding her concerns. Ms. Channels and Mr. Deshields did not speak personally, and Ms. Channels testified that Mr. Deshields did not speak with her regarding Mr. Godwin's instructions on receiving a permit for a salon.

Mr. Deshields testified that he came back to the property almost every day (six or seven times total) in response to Ms. Channels' messages. Mr. Deshields would check on the work but did not stay to perform work personally.

7

Ms. Channels testified that at some point in May 2014 neither Mr. Deshields nor his workers returned to the work site. Mr. Deshields testified that he did not return to the work site in May 2014 because he received a letter from Ms. Channels' lawyer.

At the time construction stopped, Ms. Channels had paid Mr. Deshields $14,000: a $5,000 deposit and $9,000 after the trusses were set. Ms. Channels has not paid Mr. Deshields the final $4,100 payment, which is due on completion. Mr. Deshields testified that the following work remained unfinished at the time that construction stopped: (1) installation of insulation in the walls of the Pole Building; and (2) installation of "firewall" type drywall in the Breezeway.

Mr. Deshields testified that the insulation could not be installed at the time work stopped because—if Ms. Channels intended to have electricity in the Pole Building—Ms. Channels would need to engage an electrician to install electrical wiring first so that the wiring could be inspected before insulation is installed over the wiring. Mr. Godwin also testified that an electrical inspection could not occur if there was insulation covering the wiring.

After construction stopped, Ms. Channels contacted several contractors to complete the project, but Ms. Channels lacked the wherewithal to afford repair of the Pole Building or completion of a salon. Sussex County has not issued a certificate of occupancy for the Pole Building, and it is currently only used for storage.

*Condition of the Pole Building at the Stop of Construction*

With regard to the written specifications for the Pole Building—i.e. the size and/or spacing of the posts, carriers, skirtboard, purlins, side girts, trusses, footers, overhangs, metal walls, and the concrete pad—Mr. Deshields testified item by item and affirmed that the Pole Building conforms to these specifications, and there is no allegation or evidence to show that the Pole Building does not conform to the written specifications. Ms. Channels' breach of contract claim

8

is based on allegedly unworkmanlike construction and extrinsic evidence of additional contractual duties.

In support of her breach of contract claim, Ms. Channels testified as to her observations of the condition of the Pole Building and Breezeway and introduced the testimony of her expert witness, Vincent Tallarico. Mr. Tallarico works all over Sussex County doing residential construction work through his business, Special Effects, LLC. Ms. Channels contacted Mr. Tallarico in 2014 to get an opinion on the work performed by Mr. Deshields and to get an estimate for interior finishing.[4]

With regard to the allegedly unworkmanlike construction of the Pole Building and Breezeway, Mr. Tallarico testified to a number of issues with the Pole Building and Breezeway not being properly finished and fastened so as to prevent water intrusion. Mr. Tallarico's opinion regarding the inadequacy of Mr. Deshields' construction to prevent water intrusion is consistent with Ms. Channels' observations of water in the Pole Building and Breezeway after rain and with photographs taken by Ms. Channels that were submitted into evidence. Ms. Channels' photographs show water inside the Pole Building and Breezeway.[5] On this point, although Mr. Deshields testified that he built the Pole Building and Breezeway correctly and adequately, Mr. Deshields admitted that water should not be able to come into a properly built pole building.

With regard to the exterior metal of the Pole Building's walls, Mr. Tallarico testified that, where there are lines of screws fastening the exterior metal to the wood frame, there are some screws missing, mostly in the front of the Pole Building, resulting in the exterior metal not being properly fastened to the frame. Mr. Tallarico testified that the minimum standard for construction

---

[4] Plaintiff's Exhibit 2.
[5] Plaintiff's Exhibit 1A–J.

requires the fastenings to be closed and tight, which would include consistent and even spacing between screws.

With regard to where the existing house connects to the Breezeway, Mr. Tallarico testified that the house's existing siding was removed in some place but not in others, leaving gaps through which sunlight could be seen where the two structures connect. According to Mr. Tallarico, to prevent water intrusion at this connection, the siding should have been removed completely before the two structures were joined together with watertight flashing or flashing paper. Although the structures' connection did have flashing installed, Mr. Tallarico testified that the flashing was not installed so as to properly deflect water away, allowing water to come down between the flashing and the house and into the Breezeway.

With regard to where the Breezeway connects to the Pole Building, Mr. Tallarico testified that the connection between the Breezeway and the Pole Building is also not watertight and that and that daylight can be seen through where the structures connect.

Mr. Tallarico estimated that the cost to correct the flashing and siding issues where the Breezeway connects to the existing house and to the Pole Building would be $2,425.

As to other issues with the construction of the Pole Building and the Breezeway, Mr. Tallarico testified that there were openings around the tops and the bottoms of the metal walls of the Pole Building and at the peak of the Pole Building. Despite identifying the openings around the tops of the metal walls and at the peak of the Pole Building as construction issues, Mr. Tallarico did not offer an opinion on how to repair either of those openings or the cost. While Mr. Tallarico testified that, at a minimum, there should be a line of silicone along the openings at the bottoms of the metal walls, Mr. Tallarico did not offer an opinion on the cost of such a correction.

10

On the subject of the walls of the Pole Building, Ms. Channels and Mr. Tallarico both testified that the walls of the Pole Building currently consist only of the exterior metal and the wood frame. The Pole Building walls do not have any insulation or drywall. Mr. Tallarico testified that the cost to install lumber to accommodate drywall in the Pole Building would be $8,000–$9,000 and the cost to install wall and ceiling insulation would be $2,500. Mr. Tallarico did not give an opinion regarding the cost to install drywall.

Finally, on the subject of the windows, Ms. Channels testified that the windows installed by Mr. Deshields were not watertight and water leaked through the windows. One of the pictures taken by Ms. Channels clearly shows water pooling on the wood frame immediately below one of the Pole Building's windows. Mr. Deshields testified that Mr. Godwin directed him to place tape around the windows, but it is not clear from his testimony whether he or his workers taped the windows. Mr. Tallarico did not offer an opinion regarding the cost to weatherproof the windows.

## DISCUSSION

To prevail on a breach of contract claim, a plaintiff must prove three elements by a preponderance of the evidence:

(1) the existence of a contract;

(2) breach of an obligation imposed by the contract; and

(3) damages.[6]

Defendant admits that the Contract is a contract. The parties' dispute concerns Mr. Deshields' obligations under the Contract and damages.

---

[6] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (citing *Winston v. Mandor*, 710 A.2d 835, 840 (Del. Ch. 1997)).

11

*Breach of Obligation Imposed by the Contract*

There are three basic parts of Plaintiff's breach of contract claim: (1) whether Mr. Deshields breached the Contract by constructing the Pole Building and Breezeway in an unworkmanlike manner; (2) whether Mr. Deshields breached the Contract by failing to install insulation and drywall in the Pole Building; and (3) more broadly, whether Mr. Deshields breached the Contract by failing to construct a building suitable for immediate use as a salon.

The law presumes that a person who holds themselves out as a contractor competent to perform certain work "possesses the requisite skill to perform such labor in a proper manner, and implies as a part of his contract that the work shall be done in a skillful and workmanlike manner."[7] To determine whether Mr. Deshields constructed the Pole Building and Breezeway in a workmanlike manner, the Court must determine whether Mr. Deshields "displayed the degree of skill or knowledge normally possessed by members of their profession or trade in good standing in similar communities" in constructing the Pole Building and Breezeway.[8]

As to the allegation of unworkmanlike construction, Mr. Tallarico testified that the Pole Building and Breezeway should, at a minimum, be watertight, and Mr. Deshields admitted as much. Ms. Channels' testimony and the photographic documentation establish that water intrudes into both the Pole Building and the Breezeway. The Court finds that Mr. Deshields breached the Contract by failing to construct the Pole Building and Breezeway in a workmanlike manner in that the Pole Building and the Breezeway are not watertight. Mr. Tallarico testified that the cost to repair this issue is $2,425.

---

[7] *Gibbons v. Whalen*, 2009 WL 3014325, at *2 (Del. Com. Pl. Sept. 21, 2009) (quoting *Bye v. George W. McCaulley & Son Co.*, 76 A. 621, 622 (Del. Super. 1908)), *aff'd*, 2010 WL 8250809 (Del. Super. Mar. 22, 2010).

[8] *Id.* (quoting *Shipman v. Hudson*, 1993 WL 54469, at *3 (Del. Super. Feb.5, 1993)).

12

As to the allegation that Mr. Deshields failed to install insulation and drywall in the Pole Building, this allegation is intertwined with the broader claim that Mr. Deshields represented that the Pole Building would be suitable for immediate use as a salon in that both arguments rely on extrinsic evidence.

Delaware adheres to the objective theory of contracts, "i.e., a contract's construction should be that which would be understood by an objective, reasonable third party."[9] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[10] However, "[w]hen a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity."[11] The Contract does not expressly state that the Pole Building will have an interior wall surface, but the handwritten term "insulat[sic] WALLS" is ambiguous.

Mr. Deshields testified that he wrote the handwritten term "insulat[sic] WALLS" to reflect his agreement to install insulation in the walls of the Pole Building. Mr. Deshields also testified that ceiling insulation is "automatic." The emphasis on walls in the "insulat[sic] WALLS" term is consistent with interpreting "insulat[sic] WALLS" as an agreement to install insulation in the walls, rather than an agreement to install insulation and interior wall surfaces. The Court does not find Ms. Channels' testimony regarding her subjective expectation that the Pole Building would

---

[9] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).
[10] *Id.* at 368 (quoting *Eagle Indus.*, 702 A.2d at 1232).
[11] *Id.* at 374 (citing *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 55 (Del. Ch. 2001)).

have an interior wall surface persuasive because Ms. Channels did not testify as to specific representations or discussions between the parties regarding interior wall surfaces.

Similarly, on the subject of Plaintiff's broader argument—that the Pole Building would be suitable for immediate use as a salon—the Court does not find Ms. Channels' testimony that Mr. Deshields agreed to build her a salon, as opposed to a building that could be used as a salon at some point, credible.

First and foremost, the Contract does not state any intended purpose for the Pole Building.

Second, Ms. Channels' belief that Mr. Deshields agreed to build her a salon cannot square with the plainly limited scope of the Contract. While the Contract does provide for the construction of a pole building, conspicuously missing from the Contract are any terms addressing certain work necessary to render the Pole Building suitable for immediate use as a salon. For example, the Contract does not provide for the installation of: electrical wiring; plumbing; heating, ventilation, or air conditioning systems; drywall; flooring; or fixtures, such as lights, sinks, or cabinets. On the aesthetic side, the Contract does not provide for any sort of finishing, such as painting or wallpapering. In fact, despite admitting that plumbing and electric are necessary for a salon and admitting that Mr. Deshields never agreed to install plumbing or electric, Ms. Channels denied that she had any additional duties to perform in order to turn the Pole Building into a salon.

Third, while Ms. Channels testified that Mr. Deshields affirmed he could build her a salon, Ms. Channels did not testify that Mr. Deshields made any specific representations about the Pole Building or Breezeway that are inconsistent with the Contract's terms. For example, two of the Contracts specifications boxes concern the walls of the Pole Building. The first states "**POST 4' X 6' SPACED 8' O/C** our 6 X 6 POST;" the second, "**29 GUAGE** [sic] **METAL** 40 YR WARRANTY." Mr. Deshields testified that these terms refer to the walls of the Pole Building.

14

The first concerns the size and spacing of the wood frame, and the second concerns the thickness and quality of the exterior metal. Mr. Deshields testified that he went over these terms with Ms. Channels prior to signing the Contract, and Ms. Channels did not rebut Mr. Deshields testimony on the meaning of those terms.

Considering the Contract's express terms and the representations made by Mr. Deshields regarding the specific features of the Pole Building, a reasonable third party would understand that the Pole Building would resemble an unfinished garage, much like the one's pictured in Mr. Deshields' advertisement,[12] albeit one without a garage door. On this point, the fact that Ms. Channels sought out a contractor specifically for a pole building, first by contacting Delmarva Pole Buildings and then by contacting Mr. Deshields, and the fact that Ms. Channels was aware that Mr. Deshields' pole buildings are garage-type buildings, even if potentially convertible into a salon, weighs against the reasonableness of her subjective belief that the Pole Building would be suitable for use as a salon immediately, or soon after, the completion of construction.

In light of the foregoing, the Court credits Mr. Deshields interpretation of the "insulat[sic] WALLS" term and finds that Mr. Deshields breached the Contract by failing to install insulation in the Pole Building, but the Court does not find that the Contract obligated Mr. Deshields to install drywall in the Pole Building. Mr. Tallarico testified that the cost to install insulation is $2,500.

On the broader issue of whether Mr. Deshields breached the Contract by failing to build Ms. Channels a building suitable for immediate use as a salon, the Court does not find that the Contract obligated Mr. Deshields to build the Pole Building such that it would suitable for immediate use as a salon. Such work would go far beyond the express contractual obligations,

---

[12] Defendant's Exhibit 1.

15

and the Court does not find that a reasonable third party could read such an obligation into the ambiguous terms of the Contract.

*Damages*

Breach of contract damages are based upon the reasonable expectations of the parties.[13] "This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract."[14]

The Court finds that Plaintiff has shown by a preponderance of the evidence that it would cost $2,425 to fix the unworkmanlike construction of the flashing and siding and $2,500 to install insulation. It is undisputed that Plaintiff did not pay $4,100 of the contract price.

## CONCLUSION

As to Plaintiff's claim for breach of contract, the Court finds that Defendant is liable to the Plaintiff in the amount of $825. Therefore, the Court enters judgment in favor of the Plaintiff for $825 against Defendant, with costs.

**IT IS SO ORDERED.**

The Honorable Rosemary Betts Beauregard

---

[13] *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).
[14] *Id.* (citing Restatement (Second) of Contracts § 347 cmt. a).

16